[No. 43658-9-I.    Division One.    June 1, 1999.]

THERESA MARIE STENGER, ET AL., *Appellants*, v. STANWOOD SCHOOL DISTRICT, *Respondent*.

*Halleck Howitt Hodgins*, for appellants.

*David Phillip Hansen*, for respondent.

*Faith Hanna* on behalf of Washington Education Association, amicus curiae.

COLEMAN, J. — Theresa Stenger and Victoria Douwes appeal the dismissal of their claims against the Stanwood School District for injuries they sustained while working with a multihandicapped, special education student. The trial court ruled that the appellants' claims were barred by the Industrial Insurance Act, which permits such suits only if the employer deliberately intended to produce the injury.[1] In *Birklid v. Boeing Co.*, 127 Wn.2d 853, 861-65, 904 P.2d 278 (1995), our Supreme Court analyzed this exception to employer immunity and held that a deliberate intent to injure may be found where an employer had actual knowledge an injury was certain to occur and willfully disregarded that knowledge. Here, the appellants have produced evidence that the District knew its employees would continue

---

[1] "If injury results to a worker from the deliberate intention of his or her employer to produce such injury, the worker or beneficiary of the worker shall have the privilege to take under this title and also have cause of action against the employer as if this title had not been enacted, for any damages in excess of compensation and benefits paid or payable under this title." RCW 51.24.020. This statutory exception is discussed further below.

to be injured by the student, despite their efforts to modify his behavior or restrain him. Notwithstanding this knowledge, the District continued to require its employees to work with the boy, and the appellants were seriously injured. We conclude that the evidence in its entirety would permit a trier of fact to conclude that the appellants have satisfied the test for intentional injury set forth in *Birklid*, and we reverse.

## FACTS

For the purposes of our review of the summary judgment order, we set forth the facts in the light most favorable to the nonmoving party. *See Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998).

Both appellants worked for the Stanwood School District as instructional aides in special education classes and were injured while working with a severely disabled special education student, Jason Springstead. Jason's history with the District is relevant to the appellants' claims and is reviewed below.

Jason transferred to the district in 1990, when he was ten years old. Connie Hall, the District's director of special services, reviewed Jason's educational files prior to his transfer and learned Jason did not speak, read, or write, had trouble following directions, and frequently attacked his teachers and other students. Because the District's special education programs in 1990 were geared toward students with milder handicaps, the District contracted with the Sedro Woolley School District to provide services to Jason for the 1990-91 school year.

At Sedro Woolley, Jason was formally reassessed and identified as a multihandicapped student, both severely mentally retarded and severely behaviorally disabled.[2] Jason was severely developmentally delayed: his IQ was below 30 and his cognitive abilities were at a two- or three-

[2]See WAC 392-171-386, -421(2)(c), -431.

year-old's level. His language skills were at or below the level of a two-year-old. The most significant delays affected his adaptive behavior skills, particularly in the areas of social behavior and communication. Sedro Woolley's assessment noted that although Jason enjoyed being with other students and adults and watching his peers play, he "had a lengthy history of highly aggressive, extremely overactive behaviors in the school, home, and community settings."

Sedro Woolley had placed Jason on a regular campus in a self-contained, special education classroom. Candi Styer-Ferguson, a behavioral consultant, was hired to observe Jason and develop his curriculum and a behavior management plan. Jason was physically separated from the other students, and two aides were assigned to work with him. The staff wore long-sleeved shirts and rubber dishwashing gloves and wore their hair short or pulled back. The staff assigned a one-on-one paraprofessional to work with Jason at all times and implemented seclusion timeouts, physical restraint, and an extensive behavior management program. Despite these efforts, Jason managed to inflict numerous minor injuries on the instructional staff. His aggressive behavior included running, kicking, biting, scratching, pinching, hitting, pulling hair, head-butting, and screaming. Sedro Woolley's 1991 assessment concluded that although Jason had made "significant progress," he "continue[d] to require extraordinary resources to successfully access the classroom setting." It also noted that the University of Washington's Child Development and Mental Retardation Center had observed Jason and concluded a comprehensive behavior management plan coordinated between Jason's school and home would be critical to any progress past his current level of functioning. In addition, the center suggested that a short-term residential placement might be necessary to assess and modify Jason's behavioral problems.

In February 1991, a District staff psychologist assessed the adequacy of Jason's programming at Sedro Woolley and communicated the following to his physician in an attempt to have medication prescribed for him:

We are unable to provide an appropriate educational placement for [Jason] here in Stanwood due to the severity of his behavior problems[.]

Jason has historically been very difficult to manage at school . . . due to frequent scratching, biting, hair-pulling, etc. of his caregivers and teachers. In his previous school district (Bellingham), the educational team had recommended reducing his time at school to half-days due to the harm they experienced in trying to educate him. . . .

. . . Although Jason was making some progress from September to December [1990] in the reduction of aggressive behaviors and in increasing his participation in activities at school such as lunch and recess, he has demonstrated a marked increase in aggression since Christmas vacation. . . . These changes coincided with Jason's father returning to the home and Mrs. Williamson [Jason's aunt] reported that he was hitting Jason and generally disrupting the home environment. . . .

The current behavioral concerns include: screaming, biting, hitting, scratching, pulling-hair, self-abuse (hitting his head with his hands or pounding his head on the floor or table) and wetting his pants intentionally. There seems to be no pattern or predictability as to when the behaviors will occur and Jason will often run across the room and attack without warning. The school staff [has] many physical scars from his actions and he seriously disrupts others in the classroom, sometimes persisting in his aggressive attitude for up to 3½ hours. Our best behavioral interventions have not been successful in reducing the occur[r]ence[s] of Jason's aggression to acceptable levels[.]

Nevertheless, Jason was transferred to Stanwood Elementary School's self-contained "life skills" class in the fall of 1991. Stanwood Elementary staff had observed Jason at Sedro Woolley, and Julie Wheeler, Stanwood Elementary's special education teacher, testified that at that time she "felt that [Stanwood] could provide a program equal to what was being provided at Sedro Woolley." Wheeler developed a curriculum with Styer-Ferguson and worked with Jason and his Sedro Woolley aides during the summer

to become familiar with him and to learn how to restrain him. In addition, Styer-Ferguson observed Jason for five days between 1991 and 1993 and recommended strategies to de-escalate his outbursts and redirect him to the task at hand. These included using timeouts, warnings, verbal reinforcement, and rewards. Wheeler and Styer-Ferguson also posted Jason's behavioral rules and distributed them to the staff and increased the work surface between Jason and his aides.

Hall, the District's director of special services, believed Jason's communication skills and behavior improved at Stanwood Elementary because the school was closer to his home and because the larger classroom allowed the staff to isolate him more effectively. As Jason's ability to socialize with others improved, he began to go to recess and to attend occupational and speech therapy programs across the hall. However, he attended these programs primarily as an observer and still had to be checked or restrained between 10 and 48 times per day.

During the 1991-92 school year, the District provided a general training session for its employees on strategies for handling disruptive students. Wheeler testified that the training was helpful for working with Jason, but also stated that Jason became stronger over time and would wear out the staff restraining him because his adrenaline was so high. The aides testified that sometimes it took more than two adults to restrain him. In October 1992, Wheeler strained her upper body working with Jason and injured her neck, shoulder, lower back, and leg. She suffered pain, loss of motion, and numbness and filed both an accident report and a Labor and Industries (L&I) claim.

In 1993, the staff received another general training session on restraint holds, but Wheeler testified that it did not address how to restrain a very small student and thus did not make working with Jason safer. In March 1993, an aide hyperextended her fingers while working with Jason and filed an L&I claim. In April 1993, Wheeler was injured by Jason again and submitted an accident report in which she

had written, "As I sat in the class with other children present, holding an ice pack to my breast, I kept thinking, 'This is wrong. Where are my rights?'" Although Wheeler had reported that Jason had made "some great gains" toward his behavior goals by the end of his first year, she later attributed this to the staff's ability to anticipate his outbursts: "[A]t the end of the second year in '93, we realized that it wasn't so much that [Jason] had changed but that we had gotten better at reading him."

In the fall of 1993, Jason attended both Wheeler's class and a self-contained life skills class at Stanwood Middle School, and then he transferred to the middle school full-time in December 1993 or January 1994. The middle school staff had observed Jason prior to his transfer, and one of his elementary school aides transferred with him to provide the class with extra staff support. The district also obtained authorization to use soft restraints on Jason, which made him aware of his aggressive outbursts.

Jason's middle school curriculum included many of the activities he had practiced in elementary school: sorting colors and shapes; learning survival words; identifying coins; and assembling nuts and bolts. As in elementary school, Jason was physically isolated within the classroom. Similarly, the aides who worked with him were told to keep their hair tied back, to wear long-sleeved shirts, and not to wear dangling earrings. The aides also continued to use timeouts and other de-escalation strategies with Jason.

Appellant Theresa Stenger worked with Jason as an instructional aide from December 1993 to May 1994. From early 1994, instructional aides took Jason outside the classroom and into the community to shop for clothes, shoes, and food, and also to a high school for a physical education class. However, Jason continued to exhibit aggressive behavior and on several occasions attacked and injured other students. Stenger testified that Jason became more aggressive over time, especially outside the classroom, and the aides had to restrain him more frequently. One of the aides injured her lower back working with Jason and

required chiropractic treatment, but she did not formally report the incident.

In early February 1994, Stenger informed Jason's teacher, Cheri Goodwin, that two of the aides, Christina Armstrong and Sandy Holt, were not strong enough to restrain Jason. She said that she was "tired of getting hurt" while working with them and believed she would continue to be injured and asked Goodwin to change the aides' assignments. Goodwin did not change the assignments or the procedure for escorting Jason.

On February 28, 1994, Stenger injured her shoulder, back, and neck while escorting Jason to the high school gym alone. Another aide was also assigned to escort Jason that day but had remained behind. When Stenger had asked Goodwin if they could leave Jason behind as well, Goodwin had instructed Stenger to take Jason to the class. Stenger was injured while trying to restrain Jason on a flight of stairs. The other aides at the gym were escorting different students and were unable to assist her immediately.

In March 1994, Jason was formally reassessed by Hall, Goodwin, assistant principal Stuart Hobbs, and the school's psychologist and nurse. The assessment noted that Jason's intellectual abilities had not been retested because it was "unlikely that Jason's ability ha[d] changed since the prior assessment" in 1991. According to the report, Jason continued to exhibit aggressive behavior "at a very high frequency" and had difficulty working with others, following school rules, and "moving appropriately around the school building." The report also observed, "Jason needs constant supervision and must be physically guided by two adults when he is transitioning in and out of the room." The assessment team reaffirmed Jason's current placement but noted that he required a closely supervised environment.

On April 15, 1994, an aide injured her neck, back, and shoulders while escorting Jason to the bathroom. She required chiropractic treatment and filed both an accident

report and an L&I claim. That month, Chris Crookes, a behavior disorders specialist who had previously given restraint training for the District, was hired to observe Jason and provide additional training. Crookes found that Jason's individualized education program (IEP) did not contain an overall behavioral plan and recommended that the District develop a clear procedure for handling specific behaviors. Crookes suggested that two aides be available to restrain Jason outside the classroom. He also suggested that the staff wear additional protective gear and attend a de-escalation and physical containment training session with him the following month. He noted that if the training was not sufficient, the staff should undergo "a comprehensive training package and/or review at the beginning of the 1994-1995 academic year, especially if Jason continues his biting, scratching, lunging and kicking behaviors."

A one-page addendum to Jason's IEP, filed the same month, stated, "IT IS RECOMMENDED TO WEAR PROTECTIVE GLOVES, TIE BACK YOUR HAIR IF LONG, REMOVE EARRINGS, AND USE CAUTION WHEN WORKING WITH JASON[.] IF YOU CHO[O]SE NOT TO DO THESE THINGS, YOU DO SO AT YOUR OWN RISK." The memorandum also outlined several strategies the staff had used to handle Jason's in-class and out-of-class behavior.

Appellant Victoria Douwes, who had begun to work in life skills classes during the previous school year, was assigned to Goodwin's class for the 1994-95 school year. Douwes estimated she spent 80 percent of her day working with Jason. She testified that she was familiar with most of the strategies outlined in Jason's IEP and that these strategies were reviewed in periodic staff meetings. However, Douwes did not attend any of Crookes' restraint training sessions, but had attended another training where she was told that some of the restraint holds previously used by the aides were not appropriate and were potentially dangerous.

Douwes testified that Jason was very difficult to work with and very aggressive. She had observed Jason as a

substitute aide the previous year and believed the frequency of his aggressions had not decreased since then. At the beginning of the 1994-95 school year, Jason's schedule was changed and he became so violent and hard to restrain that Douwes told Goodwin she did not want to work with Jason as assigned. Goodwin responded, "[T]his is your job, and if you don't like it, then you need to leave." However, Goodwin later increased the aides' rotations away from Jason, changing the aide assigned to work with him every period.

In November 1994, Jason's IEP noted that he was on a strict behavior-modification system and reported that he was socializing with his teachers and peers more and that the frequency of his outbursts had "decreased dramatically." However, in March 1995, Goodwin apparently injured her shoulder working with Jason.

In September 1995, Douwes strained her shoulder while escorting Jason to the gym to have his picture taken. Jason began acting aggressively, and Douwes and another aide, Sandy Holt, had to bring him back to the classroom before his picture was taken.[3] After approximately two hours, Goodwin told the aides to take Jason to the gym again. Jason again acted out in the gym and had to be brought back to the classroom. Douwes later asked to be reassigned away from Jason.

In 1995, Jason transferred to the Seattle School District where he briefly attended a self-contained classroom at Rainier Beach High School. Rainier Beach had to reduce Jason's time at school because of his behavior and the injuries sustained by their staff. Later, the school temporarily removed Jason under an emergency exclusion provision, concluding that he was not ready to be placed in a

---

[3]Douwes testified: "[W]e . . . started to walk, and [Jason's] kicking, just an incredible kicking, and trying to break away. And at the same time he started to do his head butt, just literally throw his head back with all his might.

"And Sandy Holt is a much smaller person. And he was starting to head butt her into her neck areas. And . . . I came over and put my right arm behind the small of his neck or into the back of his head so that he would stop . . . because we couldn't go anywhere, I mean because by the time you're trying to duck—his head is flailing at you. He's trying to kick. He's basically trying to get out."

classroom with physically fragile students and that the "seriousness of his ag[g]ressive and unpredictable [behavior] posed a threat to students and staff."

## ISSUES

We review a grant of summary judgment de novo. *See Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). Summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Folsom*, 135 Wn.2d at 663. The burden is on the party moving for summary judgment to demonstrate there is no genuine dispute as to any material fact, and reasonable inferences from the evidence must be resolved against the moving party. *Id.*

The no-fault compensation scheme under Washington's Industrial Insurance Act generally bars civil suits by employees for injuries sustained on the job. RCW 51.04.010. An exception exists where the employer deliberately injures an employee. RCW 51.24.020. In *Birklid v. Boeing Co.*, 127 Wn.2d 853, 861-65, 904 P.2d 278 (1995), our Supreme Court concluded that our courts had traditionally interpreted the exception to employer immunity too narrowly and held that the phrase "deliberate intention" in RCW 51.24.020 meant the employer had actual knowledge an injury was certain to occur and willfully disregarded that knowledge.[4]

The first prong of the *Birklid* test requires evidence that the employer actually knew an injury was certain to occur. The appellants have produced testimony that Jason caused between 1,316 and 1,347 injuries to District staff, inflicting injuries almost on a daily basis. The injuries included scratches, gouges, bites, upper body strain; scalp, breast, neck, back, shoulder, leg, arm, wrist, hand, and finger injuries; and bruising. Six accident reports documenting neck, back, arm strain, and shoulder injuries were submit-

---

[4]In adopting this definition, the court considered and rejected two broader tests for intent in use in other jurisdictions. *Birklid*, 127 Wn.2d at 865.

ted between 1992 and 1995, and three L&I claims, including one for a back, neck, and side injury, were filed in the three years prior to Stenger's injury. Two additional L&I claims concerning shoulder, neck, and back injuries were filed in the year and a half before Douwes injured her shoulder. Finally, both director of special services Hall and assistant principal Hobbs testified that they were aware of the injuries to staff and believed that despite their precautions, the staff would continue to suffer some level of injury from working with Jason.

This evidence could persuade a trier of fact that the District had the requisite knowledge to satisfy the first prong of the *Birklid* test. Given the frequency of Jason's outbursts, the number of injuries he inflicted, and the claims filed with the District, a jury could reasonably conclude that the District had actual knowledge that the staff would continue to be injured by Jason in the future. *Cf. Folsom*, 135 Wn.2d at 667 (concluding that the plaintiffs did not allege sufficient facts to establish that by operating its business in a negligent way, a franchisee knew its employees would be killed by a former employee in a robbery).

Under the second prong of the *Birklid* test, the appellants must show that the District willfully disregarded this knowledge. The District argues that its efforts to modify Jason's behavior and provide the staff with additional training preclude a finding of willful disregard. While we appreciate the difficulties the District faced, given its obligation to provide all students with an appropriate education, our inquiry on review must focus on whether a jury could conclude that its efforts to accommodate Jason in the classroom were inadequate and thus constitute willful disregard under the *Birklid* rule.

In a similar case, an Ohio court reversed a grant of summary judgment and remanded for trial an instructional assistant's claims that her employer intentionally disregarded her requests to abate a dangerous classroom situation after

a disabled student had repeatedly injured her.[5] *Ross v. Maumee City Schools*, 103 Ohio App. 3d 58, 658 N.E.2d 800 (1995). Although the defendant had provided additional training for staff and suggestions for managing the student's behavior and had brought in a behavioral specialist to develop the student's programming, the student's teacher stated that such remedies were insufficient and the student had become increasingly aggressive. *Ross*, 103 Ohio App. 3d at 61. The court concluded that the plaintiff had produced enough evidence to suggest that the defendant knew of the danger posed by the student's behavior but "failed to take steps to eliminate the condition." *Ross*, 103 Ohio App. 3d at 65.

Here, the record supports the appellants' assertions that Jason's programming did not reduce the frequency of his violent outbursts and failed to make their work with him safer. The evidence indicates that some of the training the staff received was not effective with Jason and that many of the precautionary measures suggested by the District, such as wearing gloves and long sleeves, did not address the type of strain injuries Stenger and Douwes experienced. In fact, the evidence suggests that Jason's programming did not address the extent to which Jason injured the staff or the more serious classroom safety concerns. Neither of the behavioral consultants hired by the District reviewed the accident reports and L&I claims filed by the staff or saw Jason when he was violent and out of control. One of the consultants, Styer-Ferguson, testified that although Hall had asked her to develop programming that would create a safer environment for working with Jason, she was not told of any specific concerns and did not think any of Jason's behaviors were dangerous. She believed most of Jason's problems would be eliminated under a clear and

---

[5]Unlike the Washington statute, Ohio law does not require actual knowledge of certain injury, but rather uses a "substantial certainty" standard to define employer intent. *See Ross*, 103 Ohio App. 3d at 64-65. The remainder of the Ohio test for intentional injury, while articulated differently, is comparable to the *Birklid* requirement of willful disregard. Therefore, the Ohio court's analysis is helpful with respect to our discussion of this prong.

consistent program and that he was compliant enough to be walked to a timeout if he misbehaved.

In addition, the evidence supports the appellants' assertions that the District accepted some level of injury to the staff. When one aide complained to Hall that she feared she would be injured in the future, Hall agreed that Jason was violent and told the aide to do her best to handle the situation. Hall also testified that if staff had expressed a concern to her about future injury, she would have suggested that they apply for a different position within the district.

The appellants also contend the District failed to consider other programming options that would have addressed their concerns, including placing Jason in a more restrictive environment. The District responds that its placement determinations for Jason were constrained by its legal obligation to try to educate Jason in a mainstream educational environment.

Federal law requires the State to provide a free and appropriate public education to all children and to establish procedures to ensure that handicapped children are educated "to the maximum extent appropriate" with children who are not handicapped. 20 U.S.C. § 1412; *see also* RCW 28A.155.010; WAC 392-171-300, -471(1)(a). Courts have recognized that the latter provision expresses a strong congressional preference for integrating disabled children into regular classrooms. *See Oberti v. Board of Educ.*, 995 F.2d 1204, 1213-14 (3d Cir. 1993).

However, while state and federal regulations require school districts to place a student in his or her "least restrictive environment," school districts must also ensure that a continuum of alternative placements is available to meet the needs of each student with a disability. 34 CFR §§ 300.17, .550-.554; WAC 392-171-471, -476, -481. Such placements include instruction in regular and special classes, special schools, home instruction, and instruction in hospitals, institutions, and in other settings. 34 CFR §§ 300.17, .551(b)(1); WAC 392-171-476; *see also* RCW 28A.155.040 (authorizing school districts to contract for

residential placements). Courts have thus acknowledged that a regular classroom is not always the appropriate placement for a disabled student, particularly if the child is violent and has a negative, disruptive effect on his or her class. *See Seattle Sch. Dist. No. 1 v. B.S.*, 82 F.3d 1493 (9th Cir. 1996) (finding that placement in an out-of-state residential facility, rather than a self-contained classroom, was appropriate); *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884 (9th Cir. 1995) (affirming placement in a private educational therapy center); *Clyde K. v. Puyallup Sch. Dist. No. 3*, 35 F.3d 1396 (9th Cir. 1994) (approving an off-campus program as a temporary placement); *see also Light v. Parkway C-2 Sch. Dist.*, 41 F.3d 1223 (8th Cir. 1994) (affirming the temporary removal of a child from a self-contained classroom).

In the instant case, Hall testified that she believed the law required the District to maintain the placement of a child if it promoted his or her educational goals even though it also involved a high risk of staff injury. The District did not pursue any other placement alternatives for Jason despite his repeated attacks on other students and staff. Moreover, an early assessment had indicated that a more restrictive placement might be necessary. *See* WAC 392-171-366(1) (districts must consider and reconcile any inconsistent or contradictory opinions in the student's assessment data). Although the District had apparently sent violent special education students to residential placements or to programs outside the district, members of Jason's IEP team testified they were not aware such options were available.

In light of this evidence and the record of injuries sustained by staff, the adequacy of the District's response is a question for the trier of fact. The appellants' evidence, if believed, establishes that the District knew its efforts to modify Jason's behavior and prevent injury to staff were insufficient and that the injuries to staff would continue. A jury could reasonably conclude that the District willfully disregarded its knowledge that injuries would continue to

occur by failing to take additional measures to remedy the situation. Accordingly, we find that the appellants have raised genuine issues of fact regarding whether the District intended their injuries within the meaning of the Industrial Insurance Act and the *Birklid* test, and we reverse.

KENNEDY, C.J., and APPELWICK, J., concur.