[No. 25433-6-II. Division Two. January 19, 2001.]

THERESA MARIE STENGER, ET AL., *Appellants*, v. THE STATE OF WASHINGTON, *Respondent*.

---

*Floyd F. Fulle,* for appellants.

*Christine O. Gregoire, Attorney General,* and *Elizabeth J. Erwin, Assistant,* for respondent.

SEINFELD, J. — Theresa Stenger, a public school instructional aide, sued the State of Washington for injuries she sustained while working with a developmentally delayed student at her school. The juvenile court had previously found the child to be dependent and appointed the Depart-

ment of Social and Health Services (DSHS/DCFS) as the child's custodial agency. Stenger contends that the State was negligent in failing to place the child in a more restrictive environment and that the trial court erred in granting summary judgment to the State. Because Stenger has failed to produce facts demonstrating that the State violated a legal duty it owed her to suggest an alternative educational placement for the student, we affirm.

## FACTS

In 1992, Stanwood School District hired Stenger to work as a full-time instructional aide (IA) in the life skills program for special education students. In November 1993, Stenger went to Stanwood Elementary School to observe Jason, the student who later caused her injuries, in preparation for his transfer to the middle school where Stenger would work with him.

Jason and his sister were born with a syndrome called Springstead Syndrome, which is characterized by severe mental retardation, small physical stature, an inability to communicate, and seizures. Jason's parents were unable to care for him and, consequently, in August 1993, the juvenile court declared Jason dependent pursuant to former RCW 13.34.030(2)(d) (1992) and appointed a guardian ad litem for him. The court ordered Jason to remain in the care of Cindy Williamson, his aunt, who had been caring for him for several years, and ordered DSHS/DCFS, the custodial agency, to assist the foster parent in "accessing identified service needs" and to "assist [the] family in pursuing a guardianship." The court also ordered the foster parent to inform DSHS/DCFS of the child's needs.

Jason's violent behavior was common knowledge in the District. Staff advised Stenger about Jason's violent outbursts and advised those working with him to not wear earrings, to wear long sleeves, and to pull their hair back. The first time Stenger observed Jason, he was tied to a chair. The District designated Stenger to work with Jason

from approximately December 1993 until May 1994.

Jason injured Stenger on hundreds of occasions. Stenger did not report all the injuries because, according to Stenger, the IAs were discouraged from filling out accident reports. Instead, they kept a graph reflecting Jason's attacks. Stenger's injuries included bruises from kicks and head butts, pieces of skin ripped out of her arms and hands, and hair pulled out. Jason also injured other staff members.

On February 28, 1994, Stenger took Jason and the other life skills children to the high school for physical education. Although District procedures required two people to escort Jason around the community, on that day the school was short a staff member. But when Stenger asked the teacher if she could leave Jason behind, the teacher refused.

While Stenger was taking the children up a flight of stairs, Jason started attacking her. She was forced to carry him the rest of the way up the stairs and, at the top, to restrain him until help arrived. As a result of this incident, Stenger sustained back, neck, and shoulder injuries.

Stenger and her husband sued the State of Washington, alleging assault and battery, negligence, and a civil rights violation under 42 U.S.C. § 1983.[1] The State moved for summary judgment and subsequently moved to strike materials referred to in, but not attached to, Stenger's memorandum of authorities and the deposition of her expert witness, William Dussault.[2] The court granted the State's summary judgment motion and its motion to strike.

The Stengers now appeal.[3]

---

[1] Stenger and another staff member also sued the Stanwood School District in regard to Jason's violent behavior. The trial court dismissed their claims, finding the claims barred by the Industrial Insurance Act. The Court of Appeals reversed the trial court, concluding that the plaintiffs had produced sufficient evidence of intentional injury. *Stenger v. Stanwood Sch. Dist.*, 95 Wn. App. 802, 803-04, 977 P.2d 660 (1999).

[2] Stenger addresses only Dussault's deposition; thus, we presume that she does not claim it was error to strike the reference to the other materials.

[3] Stenger expressly abandons her § 1983 claim. Because she does not argue error as to her assault and battery claim, we presume that she has abandoned it also.

## I. Negligence

Stenger argues generally that there are genuine issues of material fact that made summary judgment inappropriate. Specifically, she asserts that the State, through DSHS/DCFS, (1) failed to disclose Jason's violent behavior to the court when it initiated the dependency petition, (2) willfully disregarded the safety of the teaching staff at Stanwood School District, (3) did not comply with its obligation as the custodial agency to place Jason in a "properly restrictive environment," and (4) negligently supervised Jason.

As a preliminary matter, the State argues that we should not review Stenger's first claim because she did not raise it below. Stenger responds that this nondisclosure is not a new issue because it is "inherent in the negligence of DSHS" regarding Jason's violent behavior. To the extent that Stenger is arguing that this nondisclosure is simply additional evidence of the State's negligence, she may raise it as part of her argument that the State breached its duty of care. But we will not review this as a separate claim of negligence because the record does not show that Stenger raised this issue below. RAP 2.5(a); RAP 9.12.

In reviewing a grant of summary judgment, we engage in the same inquiry as the trial court. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Wilson*, 98 Wn.2d at 437; CR 56(c). We must consider all the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Wilson*, 98 Wn.2d at 437. "The motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion." *Wilson*, 98 Wn.2d at 437.

■ Because this is a review of summary judgment, we confine our review to the issues that the parties raised and the trial court considered. *Babcock v. State*, 116 Wn.2d 596, 606, 809 P.2d 143 (1991). Stenger argued below that the State had supervisory authority over Jason, including an

obligation to be involved in the selection of an appropriate educational environment. Further, Stenger contended that the public duty doctrine did not bar her negligence claim because of either the special relationship or the failure to enforce exceptions to the doctrine.[4]

A. Public Duty Doctrine

■ ■ An actionable claim of negligence includes four essential elements: (1) a duty owed to the complaining party; (2) a breach of that duty; (3) resulting injury; and (4) a proximate cause between the breach and the resulting injury. *Pedroza v. Bryant*, 101 Wn.2d 226, 228, 677 P.2d 166 (1984). The threshold determination of whether a legal duty exists is a question of law for the court. *Pedroza*, 101 Wn.2d at 228. The first element, the existence of a duty, is the primary issue in this case.

■ The public duty doctrine limits a governmental entity's liability. In applying the doctrine, the court must determine whether the government owes a duty "to a nebulous public or whether that duty is owed to a particular individual." *Honcoop v. State*, 111 Wn.2d 182, 188, 759 P.2d 1188 (1988). *See also Taylor v. Stevens County*, 111 Wn.2d 159, 163, 759 P.2d 447 (1988); *Meaney v. Dodd*, 111 Wn.2d 174, 178, 759 P.2d 455 (1988) ("The public duty doctrine recognizes that a fundamental element of any negligence action is a duty owed by the defendant to the plaintiff."). There are several exceptions to the public duty doctrine.

On appeal, Stenger argues only the "special relationship" exception. In particular, she relies upon a special relationship exception derived from the *Restatement (Second) of Torts* § 315 (1965).

1. Special Relationship Exception

■ The Supreme Court has recognized two varieties of the special relationship exception to the public duty doctrine. The first, well-established exception arises where (1)

---

[4] Stenger also asserted that the Industrial Insurance Act did not bar her claim and that she had a civil rights claim under 42 U.S.C. § 1983. But she does not assert the first argument on appeal and expressly abandons her civil rights claim. Thus, we do not address either issue here.

there is direct contact or privity between the governmental agency and the plaintiff "which sets the latter apart from the general public, and (2) there are express assurances given by a public official [or agency], which (3) gives rise to justifiable reliance on the part of the plaintiff." *Taylor*, 111 Wn.2d at 166; *Meaney*, 111 Wn.2d at 178-79; *Honcoop*, 111 Wn.2d at 192.

Stenger raised this exception to the public duty doctrine below but does not address it specifically on appeal; instead, she cites only cases that rely on the *Restatement, supra*, discussed below. But even if she is relying on the direct contact theory, her argument fails as there has been no direct contact or privity between DSHS/DCFS and Stenger in which the State provided any express assurances. *See Taylor*, 111 Wn.2d at 166, 171.

2. RESTATEMENT (SECOND) OF TORTS § 315

 Under section 315 of the *Restatement (Second) of Torts*, "a duty to a particular individual will be imposed only upon a showing of a definite, established and continuing relationship between the defendant and the third party." *Honcoop*, 111 Wn.2d at 193; *see also Petersen v. State*, 100 Wn.2d 421, 426, 671 P.2d 230 (1983) (recognizing special relationship exception under section 315). "Regulatory control over a third party is not sufficient to establish the necessary control which can give rise to an actionable duty." *Honcoop*, 111 Wn.2d at 193.

Although Stenger quotes verbatim and at length from several cases and suggests that they are instructive and apply, she fails to explain their significance. In response to the State's motion for summary judgment and her initial complaint, her argument was basically that the State owed a duty to take reasonable actions to protect her from Jason's known violent behavior because Jason was a "ward" of the State. Thus, it is the "special relationship" between Jason and DSHS/DCFS that Stenger alleges created the State's duty to her.

Again, the State initially argues that we should decline to

review Stenger's section 315 claim because she failed to raise it below. Stenger contends that section 315 was "part and parcel" of her argument below because it was cited and discussed in the cases she cited. Because Stenger did address *Taggart v. State*, 118 Wn.2d 195, 218, 822 P.2d 243 (1992), which relies on the section 315 special relationship exception, we will address her argument.

Alternatively, the State argues that under Stenger's section 315 argument, DSHS/DCFS could have no greater duty than that of a parent. Thus, the State asserts that Stenger must show that DSHS/DCFS's supervision of Jason was "willful and wanton."

Section 315 states the general rule of nonliability as well as its exceptions:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

RESTATEMENT, *supra*.

Only two of the cases that Stenger describes at length are relevant here, *Taggart*, 118 Wn.2d 195, and *Petersen*, 100 Wn.2d 421.[5]

---

[5] An example of a case Stenger cites that lacks relevance is *Babcock*, 116 Wn.2d 596, which involved the State's liability for negligent foster care investigation and placement. But *Babcock* discussed only the State's immunity from liability in such cases, ultimately finding that caseworkers are not absolutely immune from such suits, reversing the trial court's grant of summary judgment on that basis. 116 Wn.2d at 598. Thus, *Babcock* is not relevant to the question of the State's duty in this case although it does stand for the proposition that caseworkers have qualified immunity for foster care placement decisions and the State has no immunity from such suits. 116 Wn.2d at 618, 622.

Stenger also discusses *Tarasoff v. Regents of Univ.*, 17 Cal. 3d 425, 551 P.2d 334, 340, 343, 131 Cal. Rptr. 14 (1976), at length. But because *Petersen* and *Taggart* adopted the reasoning in *Tarasoff*, which relied on section 315, we do not find it helpful to discuss *Tarasoff* separately. The *Petersen* court did extend the *Tarasoff* rule to include a duty to any person foreseeably endangered by the third party. *Petersen*, 100 Wn.2d at 426-28. The focus in *Tarasoff* was the therapist's failure to

The plaintiff in *Petersen* was injured in an automobile accident when she was struck by a vehicle driven by Larry Knox, who was on probation for a second degree burglary conviction. As a condition of his probation, the court had ordered Knox to participate in mental health counseling and to refrain from using drugs. *Petersen*, 100 Wn.2d at 423. He then had been involuntarily committed to Western State Hospital after he cut out his left testicle with a knife. The hospital released Knox five days before the accident. *Petersen*, 100 Wn.2d at 423.

Although Knox told Dr. Miller, his treating physician at Western State, that he had used angel dust before the emasculation incident, Dr. Miller did not inform the court that Knox had violated his probation when he sought to have Knox's detention extended. *Petersen*, 100 Wn.2d at 423-24. The day before Knox's discharge from the hospital, hospital personnel allowed him to visit his home for Mother's Day. *Petersen*, 100 Wn.2d at 424. That evening, hospital security found Knox recklessly driving his car on hospital grounds. *Petersen*, 100 Wn.2d at 424. The hospital discharged Knox as planned the next day. *Petersen*, 100 Wn.2d at 424.

The plaintiff sued the State, arguing that it was negligent either by failing to seek additional confinement time for Knox or by failing to disclose information about Knox's probation violation. *Petersen*, 100 Wn.2d at 424. Relying on section 315 and *Tarasoff v. Regents of Univ.*, 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976), the Supreme Court held that Dr. Miller had a duty to take reasonable precautions to protect anyone who might foreseeably be endangered by Knox's mental health problems. *Petersen*, 100 Wn.2d at 426-28. Because Dr. Miller failed to seek additional commitment time for Knox or take other reasonable precautions, the *Petersen* court affirmed the jury ver-

---

warn Tarasoff or her parents of the danger to her. 551 P.2d at 340. Stenger admits that she was well aware of Jason's propensities and, thus, a warning would have been superfluous.

dict in favor of the plaintiff. 100 Wn.2d at 428-29, 446.

The second case, *Taggart*, 118 Wn.2d at 199, 201, involved two parolees, Louie Brock and Keith Geyman, who assaulted and raped the plaintiffs. Although Brock had a history of alcohol abuse, his parole officer did not require Brock to obtain further counseling or submit to urinalysis after he left a halfway house, and her monitoring of Brock consisted solely of weekly meetings in her office. *Taggart*, 118 Wn.2d at 200. This supervision did not reveal that Brock had been drinking regularly. *Taggart*, 118 Wn.2d at 200.

The second parolee, Geyman, also had a history of alcohol abuse and his parole officer received a report that Geyman had been drinking, a violation of the conditions of his parole. Nonetheless, parole officers failed to follow up on the report. *Taggart*, 118 Wn.2d at 201. Then, after Geyman did not report for his monthly meeting, the parole officer completed a violation report. But the parole warrant was never entered into the state computer. *Taggart*, 118 Wn.2d at 201-02.

Several months later, after Geyman's parole officer received a tip that Geyman was in Montana and was beating his girl friend and her children, the officer sought a "fast entry" warrant to arrest Geyman. *Taggart*, 118 Wn.2d at 202. But for some reason, there was no immediate action and Geyman remained free. Two days later, Geyman raped one of the plaintiffs in the case. *Taggart*, 118 Wn.2d at 202-03.

Finding that the public duty doctrine did not bar the plaintiffs' negligent parole supervision claim, the Supreme Court reversed the summary judgment granted in favor of the State.[6] *Taggart*, 118 Wn.2d at 217-25. The court specifically recognized section 315 as another exception to the public duty doctrine and held that the relationship between a parole officer and parolees created a duty to take reason-

---

[6] The court affirmed the grant of summary judgment in favor of the State on the plaintiffs' negligent parole release claims, finding that the State was absolutely immune from liability for such decisions. *Taggart*, 118 Wn.2d at 209.

able precautions to protect anyone who might foreseeably be endangered. *Taggart*, 118 Wn.2d at 218, 219 n.4 (citing *Petersen*, 100 Wn.2d at 428).

The *Taggart* court noted that there is a duty under section 315 only if there is a showing of a " 'definite, *established and continuing relationship* between the defendant and the third party.' " 118 Wn.2d at 219 (quoting *Honcoop*, 111 Wn.2d at 193). The court found that statutes giving parole officers the authority to supervise parolees were sufficient to establish such a relationship and to show that officers have "taken charge" of parolees under section 319, *Restatement, supra.*[7] *Taggart*, 118 Wn.2d at 219, 220 ("When a parolee's criminal history and progress during parole show that the parolee is likely to cause bodily harm to others if not controlled, the parole officer is under a duty to exercise reasonable care to control the parolee and to prevent him or her from doing such harm."). The court rejected the State's argument that a parole officer cannot "take charge" of a parolee because it is not a custodial or continuous relationship. *Taggart*, 118 Wn.2d at 222-23.

Finally, the court noted that the parole officers' duty extended to anyone foreseeably endangered by the parolees' dangerous propensities and that such foreseeability is typically an issue for the jury unless reasonable minds could not differ. *Taggart*, 118 Wn.2d at 224. Because reasonable minds could differ in that case, the reviewing court held that the trial court erred in dismissing the plaintiffs' claims.[8] *Taggart*, 118 Wn.2d at 224-25.

Here, the State contends that it lacked the authority to change Jason's educational placement under state and federal law. Stenger has not shown otherwise.

---

[7] Section 319 provides: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from *doing such harm.*"

[8] The court also held that lack of proximate cause was not a valid basis for dismissing plaintiffs' claims. *Taggart*, 118 Wn.2d at 225-26 (noting that legal causation so intertwined with duty that former can be answered by deciding the latter).

Although the juvenile court's dependency order gave DSHS/DCFS "full power to . . . provide all necessary medical, dental, or psychological care," the power to authorize medical care does not equate with the authority to determine the appropriate educational placement. The disposition order also directed Williamson, the foster parent, to notify the State of Jason's needs and directed the State to assist her in accessing those needs.[9] Although it is undisputed that Williamson advised Jason's caseworker about the boy's violent behavior, nothing shows that Williamson or Stanwood School District expressed a desire to change Jason's educational placement.

Stenger does not address DSHS/DCFS's authority to make or authorize such a change. She merely argues that because Jason was a "ward" of the State pursuant to the dependency order, the State had a duty to protect her from Jason's violent behavior by placing him in a more appropriate educational environment.

---

[9] The disposition order stated:

MOTHER SHALL:

1. Cooperate with the case plan as it is developed.

2. Have her children reside with her every other weekend.

3. Execute the necessary releases of information in order that the children receive services.

FATHER SHALL:

1. Contact DSHS and cooperate in development of case plan.

CHILD:

1. This child is severely developmentally disabled.

2. It does not appear that the child is able to understand abstractions. It is expected the child will continue to attend special education classes, take medication and learn basic survival words.

DSHS/DCFS:

1. Foster parent will inform Department of child's needs.

2. Foster parent will cooperate with case plan and provide food, clothing, shelter and emotional nurturance to the child.

3. DSHS shall provide medical coupons and funding for placement.

4. DSHS shall assist foster parent in accessing identified service needs.

5. DSHS shall assist family in pursuing a guardianship.

Clerk's Papers at 120.

Federal law requires the State, in return for financial assistance, to provide free appropriate education to all children with disabilities. 20 U.S.C. § 1412. Federal law provides that "to the maximum extent appropriate," children with disabilities should be educated with children who are not disabled. Former 20 U.S.C. § 1412(5) (1994) (currently (a)(5)(A)).

Federal law also requires the development of an individualized education program (IEP) for each child with a disability. 20 U.S.C. § 1414(d) (formerly (a)(5)); 34 C.F.R. §§ 300.340(a), .341. An IEP team, composed of the child's parents, teacher(s), a representative of the public agency and others not relevant here, develops the IEP. 34 C.F.R. § 300.344. But the definition of "public agency" does not include DSHS/DCFS. *See* former 34 C.F.R. § 300.14 (1994).[10] Further, federal regulations specifically provide that the public agency must assign an individual to act as a surrogate parent to a child who is a ward of the state; such a surrogate cannot be an employee of a public agency "involved in the education or care of the child[.]" Former 34 C.F.R. § 300.514(a)(3), (b), and (d)(1) (1994) (currently § 300.515(a)(3), (b), and (c)(2)(i)).

Thus, federal and state law limit DSHS/DCFS's role to responding to requests for assistance in finding services.[11] The record reflects that Stanwood School District, with input from Jason's aunt, drew up Jason's IEP and did not involve DSHS/DCFS in the process.

Stenger cites 34 C.F.R. § 300.551 and former WAC

---

[10] Former 34 C.F.R. § 300.14 defined "public agency" as:

the [state educational agency], [local educational agencies], [intermediate educational units], and any other political subdivisions of the State that are responsible for providing education to children with disabilities.

(currently § 300.22). Further, former WAC 392-171-456 (Supp. 1993) specifically required the school district, with no reference to any other state agency, to initiate and conduct the meeting to develop the IEP.

[11] The federal regulation defining the IEP team allows for the participation of "[o]ther individuals at the discretion of the parent or agency." Former 34 C.F.R. § 300.344(a)(5) (1994) (currently (a)(6)).

392-171-476 (1995)[12] in her statement of the case to this court, apparently suggesting that DSHS/DCFS, as the "public agency," was required to ensure that there was a "continuum of alternative placement" options available for Jason. But, as we noted above, "public agency," as defined in 34 C.F.R. pt. 300, does not include DSHS/DCFS. Thus, Stenger's citations are not relevant to the question of the State's duty.

Therefore, Stenger has failed to demonstrate the existence of a special relationship between Jason and the State that allowed the State to make educational decisions for Jason. Consequently, she has not overcome the public duty doctrine's general rule of nonliability. Therefore, the trial court did not err in granting summary judgment in the State's favor.

B. Proximate Causation and Breach

Because we find that the State did not owe a duty to Stenger, we need not address her proximate cause and breach issues.

## II. Motion to Strike

Stenger also argues that the trial court erred in granting the State's motion to strike William Dussault's deposition because the deposition is "critically important in understanding this case" and is of "great assistance to the trier of fact" in determining a fact in issue. The State responds that Dussault's deposition contains inadmissible legal conclusions and testimony beyond Dussault's competency.

▮▮ We review a trial court's ruling on a motion to strike for an abuse of discretion. *King County Fire Prot. Dists. Nos. 16, 36, 40 v. Hous. Auth.*, 123 Wn.2d 819, 826, 872 P.2d 516 (1994); *Orion Corp. v. State*, 103 Wn.2d 441, 462, 693 P.2d 1369 (1985). Experts may not offer opinions of law in the guise of expert testimony. ER 704 cmt.; *King County Fire Prot.*, 123 Wn.2d at 826 n.14; *Orion Corp.*, 103

---

[12] Currently, this regulation is found at WAC 392-172-174.

Wn.2d at 461. Further, under CR 56(e), affidavits must set forth facts admissible in evidence that are made on personal knowledge.

William Dussault, a practicing attorney, works primarily in the area of disability law. His deposition initially sets out his qualifications and areas of practice within disability law and explains how he became involved in this case. He then lists the documents he reviewed in forming his opinion as an expert witness in this case.[13] After this introductory material, Dussault responded to questions regarding disability related legal issues, "particularly as they arise under Section 504 of the 1973 Rehabilitation Act, the Americans with Disabilities Act, the Individuals with Disabilities Education Act, at the state and federal level." He also responded to questions about his experience representing children with behavioral disabilities and the relationship between DSHS/DCFS and local school districts. For example, he discussed whether Jason's aunt had the legal authority to participate in the development of an IEP for Jason from August 1993 to July 1994.

In essence, Dussault was expressing his opinion as to whether DSHS/DCFS fulfilled its obligations as the substitute parent in developing an appropriate educational program for Jason at the time Stenger was injured. Because Dussault's testimony primarily consisted of his legal opinion as to DSHS/DCFS's obligations to Jason under state and federal law and the agency's satisfaction of these obligations, the trial court did not abuse its discretion in striking the deposition. Stenger's assertion that Dussault's deposition is critically important to her case does not negate the nature of the opinions Dussault expressed.

Further, Stenger's attempt to distinguish between the question of whether an expert opinion is admissible under ER 702 through ER 705 versus whether the opinion is sufficient to raise an issue of material fact is not persuasive. Expert opinion that consists solely of legal conclusions

---

[13] Those materials included court documents from the case, Jason's dependency documents, and the depositions of Jason's caseworker and aunt.

is not admissible under the Rules of Evidence and it cannot, by its very nature, create an issue of material fact when it contains only legal conclusions. *See Orion Corp.*, 103 Wn.2d at 461-62 (noting that affidavit containing legal conclusions must be disregarded but trial court may consider factual conclusions while disregarding legal conclusions).

Therefore, finding no trial court error, we affirm the ruling granting the State's motion to strike and the summary judgment of dismissal.

ARMSTRONG, C.J., and QUINN-BRINTNALL, J., concur.

Reconsideration denied February 22, 2001.

Review denied at 144 Wn.2d 1006 (2001).