[No. 21537-7-III.   Division Three.   January 27, 2004.]

TERESA R. BYRD, *as Personal Representative, Respondent*, v. SYSTEM TRANSPORT, INC., ET AL., *Petitioners*.

*David L. Martin, Jeffrey P. Downer,* and *Alison H. Killebrew* (of *Lee, Smart, Cook, Martin & Patterson, P.S., Inc.*), for petitioners.

*Michael J. Riccelli,* for respondent.

¶1 KURTZ, J. — T-W Transport, Inc.; Wade Reiber and Irma Reiber, husband and wife; and John Doe and Jane Doe, husband and wife, successfully sought discretionary review of the court's denial of their motion for summary judgment dismissal of the wrongful death action brought by Teresa Byrd on behalf of the estate of her sister, Paula Jo Guttierrez. They contend the court erred by concluding this suit is not barred by Title 51 RCW of Washington's Industrial Insurance Act. We hold T-W is immune under RCW 51.04.010 because there was no showing of a deliberate intent to harm Ms. Guttierrez.

## FACTS

¶2 Paula Jo Guttierrez was employed by T-W Transport, Inc., as a truck driver trainee when she suffered death from dehydration on a long-haul driving trip in February 2000. Ms. Guttierrez was assigned to train with Wade Reiber, one of T-W Transport, Inc.'s, regular drivers, when her death occurred. Mr. Reiber had previously trained eight or nine drivers, including two female drivers. Mr. Reiber drove a 1998 Peterbilt conventional style tractor with a sleeping compartment that was separated from the cab by a curtain. The compartment contained a double bunk bed sleeper.

¶3 Ms. Guttierrez was first assigned to Mr. Reiber as a trainee in January 2000. Their initial road trip lasted 7 to 10 days. Mr. Reiber stated that he and Ms. Guttierrez had a personality conflict on their first trip. He stated that Ms. Guttierrez did not like his teaching style or the way he presented things to her. Mr. Reiber neither complained about Ms. Guttierrez being assigned to him, nor asked to have her removed from his supervision.

¶4 On Thursday, February 3, 2000, during their second trip together, Mr. Reiber and Ms. Guttierrez stopped in Santa Rosa, New Mexico, for lunch and to take showers. Ms. Guttierrez then drove approximately three hours to Grants, New Mexico, where she complained about not feeling well. This was Mr. Reiber's first indication that Ms.

Guttierrez was ill and possibly suffering from diarrhea. Mr. Reiber made a telephone call to Pat Hobbs, a dispatcher for T-W Transport, Inc., to advise him that they had arrived in Grants and that Ms. Guttierrez was ill. Mr. Hobbs directed Mr. Reiber to continue on to Phoenix, Arizona, where Ms. Guttierrez could get a motel room if she needed to get out of the truck.

¶5 Mr. Reiber drove almost continuously from approximately 4:30 P.M. on Thursday until he arrived at the designated drop site in Phoenix about 6:00 A.M. on Friday. Ms. Guttierrez, who slept in the sleeper portion of the cab during that time, got up at approximately 8:00 or 8:30 Friday morning, said that she still was not feeling well, and asked for some water. Mr. Reiber purchased 16 ounces of water for her and saw her drink all of it. Ms. Guttierrez used the rest room.

¶6 The two continued to a truck stop in Phoenix where Mr. Reiber purchased additional water for her. He then made arrangements to have dinner with some friends at the truck stop in the late afternoon. He does not know whether Ms. Guttierrez got out of the truck at the truck stop. Mr. Reiber finished dinner with his friends about 6:00 P.M., stayed at the truck stop for awhile longer, and then returned to the truck to sleep. Since Ms. Guttierrez was asleep in his bunk, he slept behind the wheel.

¶7 Mr. Reiber woke at approximately 4:00 A.M. on Saturday and returned to the prior day's drop site to pick up his next load. He left there about 5:00 A.M. en route to Fontana, California, where he and Ms. Guttierrez had planned to take showers and eat. Upon arriving in Fontana, he woke Ms. Guttierrez to ask her how she was feeling and whether she needed anything. She told him that she wanted to be left alone.

¶8 They arrived in Wheeler Ridge, California, at approximately 6:00 or 7:00 P.M. on Saturday evening when Mr. Reiber discovered that Ms. Guttierrez had been unable to control her bowel movements and had defecated on the passenger seat of the truck. Mr. Reiber asked her what was

wrong and whether she needed anything, but she did not respond other than to say she wanted to be left alone.

¶9 Becoming concerned about Ms. Guttierrez's condition, Mr. Reiber called the shop in Spokane to ask for assistance and reached an employee named Bruce. Mr. Reiber did not know whether Bruce was a supervisory employee. Bruce and Mr. Reiber attempted to contact the persons on the emergency phone list but none were available. The two then decided that the best course of action was to go to French Camp, California, where the company had its own facility. Mr. Reiber did not realize the severity of Ms. Guttierrez's condition and did not believe it was life threatening.

¶10 Mr. Reiber drove to Fresno, California, where he made a delivery at approximately 6:00 or 7:00 A.M. on Sunday. He left there between 8:00 and 9:00 A.M. and drove to French Camp. When Mr. Reiber tried to wake Ms. Guttierrez at approximately 12:00 P.M. in French Camp, he discovered she was dead. Mr. Reiber noted that there was at least one bottle of water in the sleeper that was three-quarters empty.

¶11 The San Joaquin County Sheriff-Coroner's Report stated that the death was reported to its office at 12:10 P.M. on February 6, 2000, by French Camp fire department personnel who responded to Mr. Reiber's 911 call. An autopsy performed the following morning listed the date and time of death as February 5, 2000, at approximately 2000 hours. Death was determined to be from the natural causes of dehydration and acute enterocolitis.

¶12 William J. Brady, M.D., medical expert for Ms. Byrd, stated in his affidavit that death due to dehydration was generally reversible until 30 to 60 minutes prior to death, provided the patient was intravenously rehydrated. He commented that "any ordinary person with ordinary skills of observation and 'common sense'" should have observed that Ms. Guttierrez's condition was declining with each passing hour. Clerk's Papers (CP) at 114. He further expressed his doubts that Ms. Guttierrez would have been

able to intelligibly communicate for 18 to 20 hours prior to her death.

¶13 Mr. Reiber met with members of Ms. Byrd's family on February 11, 2000. Ms. Byrd and Donald Deck, brother of Ms. Byrd, provided essentially the same testimony about that meeting in their affidavits. Mr. Reiber told them Ms. Guttierrez appeared to be "deathly ill" on Saturday, February 5, 2000. CP at 120. He did not tell them he saw Ms. Guttierrez drink any of the water he purchased for her. He admitted that Ms. Guttierrez did not speak with him at all on Saturday, February 5. Rather, when he asked her more than once if she wanted to see a doctor, she "just stared at him, with no response." CP at 121. Mr. Deck asked whether Mr. Reiber was worried about complaints that Ms. Guttierrez had previously filed against him. Mr. Reiber responded that the situation was made more difficult because he had to cover himself.

¶14 On behalf of Ms. Guttierrez's estate, Teresa Byrd brought this wrongful death action against System Transport, Inc.; T-W Transport, Inc.; Wade Reiber and Irma Reiber, husband and wife; and John Doe and Jane Doe, husband and wife. System Transport, Inc., and T-W Transport, Inc., are separate corporations, both wholly owned by Trans-System, Inc. The drivers are employed only by the company for which they drive.

¶15 The defendants moved for summary judgment. The trial court dismissed the claims against System Transport, Inc., finding that it did not directly employ Ms. Guttierrez. The court, however, refused to dismiss the claims against the remaining parties (hereinafter T-W). T-W filed a motion for discretionary review, which was granted.

## ANALYSIS

¶16 Summary judgment shall be granted if the pleadings, affidavits, depositions and admissions demonstrate there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

CR 56(c); *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998) (citing *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 220, 802 P.2d 1360 (1991)). The moving party must first show that no genuine issue of material fact exists. *Folsom*, 135 Wn.2d at 663 (citing *Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 349, 588 P.2d 1346 (1979)). Any reasonable inferences based on the evidence must also be resolved against the moving party. *Folsom*, 135 Wn.2d at 663. The burden is then on the nonmoving party to establish a dispute regarding an element essential to its case. *See id*. An appellate court engages in a de novo standard of review with regard to a trial court ruling on a summary judgment motion. *Id*. This requires the appellate court to examine all the evidence presented to the trial court. *Id*.

¶17 Subject to only one exception, Washington's Industrial Insurance Act (the Act) mandates that an employee's sole remedy for injuries sustained in his or her work, regardless of fault, is found within the provisions of the Act. RCW 51.04.010, RCW 51.24.020. If the injury to the worker results from the deliberate intention of his or her employer to produce such injury, the worker may maintain a cause of action against the employer for any damages in excess of those compensated under the Act. RCW 51.24.020.

¶18 RCW 51.24.020 was enacted in 1911. *Birklid v. Boeing Co.*, 127 Wn.2d 853, 859, 904 P.2d 278 (1995). Washington courts have narrowly interpreted the statute to consistently require a specific intent to injure. *Id*. at 860 (citing *Nielson v. Wolfkill Corp.*, 47 Wn. App. 352, 355, 734 P.2d 961 (1987)). Neither gross negligence nor the failure to observe safety procedures constitute a specific intent to injure. *Birklid*, 127 Wn.2d at 860 (citing *Biggs v. Donovan-Corkery Logging Co.*, 185 Wash. 284, 54 P.2d 235 (1936); *Peterick v. State*, 22 Wn. App. 163, 189, 589 P.2d 250 (1977), *overruled on other grounds by Stenberg v. Pac. Power & Light Co.*, 104 Wn.2d 710, 709 P.2d 793 (1985)). Further, an act that is substantially certain to produce an injury is not sufficient to show deliberate intent. *Birklid*, 127 Wn.2d at

860 (citing *Higley v. Weyerhaeuser Co.*, 13 Wn. App. 269, 271-72, 534 P.2d 596 (1975)). Rather, the employee must prove the employer had actual knowledge that certain injury would occur and the employer willfully disregarded that knowledge. *Birklid*, 127 Wn.2d at 865-66.

¶19 *Birklid* was the first Washington case to hold that deliberate intent could be found in situations apart from those involving assault or battery. *Id.* at 861-62 (distinguishing *Perry v. Beverage*, 121 Wash. 652, 209 P. 1102, 214 P. 146 (1922)). In February 1987, a Boeing supervisor requested improved ventilation because employees suffered dizziness, dryness in nose and throat, burning eyes, and stomach ailments during preproduction testing of a new phenol-formaldehyde resin. *Birklid*, 127 Wn.2d at 856. Boeing management denied the supervisor's request for economic reasons. Once full production commenced, employees complained of dermatitis, rashes, nausea, headaches and dizziness. Some passed out on the job. Although the same supervisor alleged that the symptoms were caused by exposure to the resin, Boeing maintained that the level of exposure to the chemicals was safe. *Id.* at 856-57.

¶20 The court noted this was the first Washington case in which employees were injured by unsafe working conditions before the accident leading to litigation occurred. "There was no accident here." *Id.* at 863. Rather, Boeing chose to put the new resin into production even though it knew in advance that the phenol-formaldehyde fumes would make its employees ill. *Id.* at 862-63. In fact, Boeing observed its workers become ill from exposure to the resin and continued to use it. *Id.* at 863.

¶21 Courts have consistently applied the *Birklid* standard to find a loss of employer immunity under RCW 51-.24.020 where evidence established a pattern of recurring employee complaints of injuries caused by continuing employer practices. *See Baker v. Schatz*, 80 Wn. App. 775, 912 P.2d 501 (1996) (General Plastics Manufacturing Co. intentionally exposed its employees to toxic chemicals that

caused frequent complaints of breathing difficulty, severe headaches, nausea, dizziness and skin rashes); *Stenger v. Stanwood Sch. Dist.*, 95 Wn. App. 802, 977 P.2d 660 (1999) (district continued to require its employees to work with a multihandicapped, special education student who had inflicted more than 1300 injuries to district staff over five years); *Hope v. Larry's Mkts.*, 108 Wn. App. 185, 29 P.3d 1268 (2001) (Larry's refused to discontinue its use of industrial strength cleaners that caused rashes and blisters on its employees' hands, arms, legs and chests).

¶22 Conversely, the courts have refused to find deliberate intent where there was no previous record of harm sufficient to charge the employer with knowledge of certain injury and willful disregard of that knowledge. *See Goad v. Hambridge*, 85 Wn. App. 98, 931 P.2d 200 (1997) (no deliberate intent where employer was advised of machine's potential for serious injury and failed to advise employee of those concerns); *Henson v. Crisp*, 88 Wn. App. 957, 946 P.2d 1252 (1997) (no deliberate intent where employer intentionally pointed and fired a toy gun at an employee, causing her to experience severe emotional distress); *Judy v. Hanford Envtl. Health Found.*, 106 Wn. App. 26, 22 P.3d 810 (2001) (no deliberate injury where employer failed to inform employee of her physical limitations disclosed by evaluation even though she suffered injury on the job 10 months later as a result of that limitation); *see also Folsom*, 135 Wn.2d at 667 (no deliberate intent where employer knew about former employee's criminal history and propensity for sexual harassment of female co-workers, and failed to take security measures to protect female employees).

¶23 Ms. Byrd contends that the condition of Ms. Guttierrez's employment is an obvious factual issue to be considered by a jury. She cites *Baker* for the proposition that deliberate intent may be found when an employer knows its employees are suffering from an illness and that certain injury will occur if the working environment is not modified. She relies on *Hope* for its premise that an employer's knowledge of continuing injury in the workplace

coupled with insufficient remedial efforts presents a question of fact as to the intent to injure. She finds support in *Stenger* for the principle that a plaintiff may establish willful disregard of an employer's knowledge of certain injury by providing evidence to challenge its remedial measures. But Ms. Byrd ignores the distinguishing factors in those cases: each involved an employer whose practices directly caused the employee's injury, and who refused to take appropriate remedial measures despite repeated employee complaints. T-W did not cause Ms. Guttierrez's intestinal illness. T-W did not engage in practices that denied Ms. Guttierrez or any other employee proper hydration or nourishment. T-W neither had a history of employees who suffered from dehydration, nor had it previously experienced an employee death due to dehydration.

¶24 Ms. Byrd has failed to establish that T-W caused Ms. Guttierrez's injuries, had actual knowledge that she would likely die, and willfully disregarded that knowledge. Because Ms. Byrd has not demonstrated the deliberate intent required by RCW 51.24.020, T-W is afforded immunity under RCW 51.04.010 and is entitled to summary judgment as a matter of law.

¶25 Reverse.

SCHULTHEIS, J., concurs.

¶26 KATO, C.J. (dissenting) — I respectfully dissent. In my view, we improvidently granted discretionary review because the trial court's decision satisfies none of the grounds in RAP 2.3(b) for accepting such review. I would dismiss the appeal and remand for trial.

Review denied at 153 Wn.2d 1004 (2005).