79 P.3d 18 (2003)
119 Wash.App. 95
Jeanette VALLANDIGHAM and Melinda Clarke, Appellants,
v.
CLOVER PARK SCHOOL DISTRICT NO. 400, a municipal corporation, Respondent.
No. 30301-9-II.
Court of Appeals of Washington, Division 2.
November 12, 2003.
Halleck Howitt Hodgins, Law Offices of Halleck H. Hodgins, Seattle, WA, for Appellant.
William A. Coats, Attorney at Law, Tacoma, WA, for Respondent.
Faith Hanna, Washington Education Ass'n., Federal Way, WA, Jennifer Lane Crowder, Christopher Lee Hirst, Preston Gates & Ellis LLP, Seattle, WA, for Amicua Curiae.
*19 BRIDGEWATER, J.
Jeanette Vallandigham and Melinda Clarke, special education instructors at Woodbrook Middle School, sued Clover Park School District (Clover Park) for injuries caused by a handicapped student who had a history of aggression. They sued under the deliberate intention exception to the Industrial Insurance Act (chapter 51.24 RCW), but the trial court granted summary judgment in Clover Park's favor. Vallandigham and Clarke appeal, alleging that issues of material fact exist as to whether Clover Park willfully disregarded its actual knowledge of their certain injury. We affirm the trial court's judgment, holding that no issue of material fact exists on the issue of willful disregard. Clover Park took many steps to alleviate the risk posed by the student, and for us to hold these measures inadequate would wrongly introduce a negligence standard into the deliberate intention exception.
R.M. was born January 4, 1986. He is an autistic child with a seizure disorder and the cognitive ability of a two-to-three year old. He transferred to the Clover Park School District in 1995. Throughout his time in Clover Park, R.M. exhibited aggressive behavior and inflicted injuries of varying severity on students and staff.
R.M. was 13 years old when he began the 1999-2000 school year. During that year, R.M.'s aggression increased, and he inflicted injuries on a more regular basis. His instructors during the year were Vallandigham and Clarke.[1] On October 26, 1999, while Vallandigham tried to intervene in one of R.M.'s attacks, he shoved her, causing her to fall backwards, hit her head, and lose consciousness. The next day, October 27, R.M. bit Clarke's right breast while she tried "to distract his attention away from the other students." 3 Clerk's Papers (CP) at 459. The bite broke the skin and left a bruise. R.M. remained in Vallandigham and Clarke's class for most of the remainder of the school year. During this time, Vallandigham and Clarke suffered various injuries. R.M. left middle school for Lakes High School in the 2000-01 school year.
Vallandigham and Clarke received L & I benefits for their injuries, but they sought additional damages against Clover Park in a suit filed in Pierce County Superior Court. They claimed, under RCW 51.24.020, that Clover Park deliberately intended their injury. On Clover Park's motion, the trial court granted summary judgment against Vallandigham and Clarke.
When reviewing an order of summary judgment, we engage in the same inquiry as the trial court. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c). A question of fact may be determined as a matter of law when reasonable minds could reach but one conclusion. Graff v. Allstate Ins. Co., 113 Wash. App. 799, 802, 54 P.3d 1266 (2002), review denied, 149 Wash.2d 1013, 70 P.3d 964 (2003).
"In a summary judgment motion, the burden is on the moving party to demonstrate that there is no genuine issue as to a material fact and that, as a matter of law, summary judgment is proper." Atherton Condo. Apartment-Owners Ass'n Bd. of Directors v. Blume Dev. Co., 115 Wash.2d 506, 516, 799 P.2d 250 (1990). The burden then shifts to the nonmoving party to set forth specific facts sufficiently rebutting the moving party's contentions and disclosing the existence of a material issue of fact. Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wash.2d 1, 13, 721 P.2d 1 (1986). We consider all facts submitted and all reasonable inferences from them in the light most favorable to the nonmoving party. Wilson, 98 Wash.2d at 437, 656 P.2d 1030.
Industrial insurance normally provides the exclusive remedy for an employee injured in the course of his or her employment. Chapter 51.24 RCW; Birklid v. Boeing Co., 127 Wash.2d 853, 855, 904 P.2d 278 (1995). That *20 exclusivity principle, however, is not absolute. RCW 51.24.020 provides that, "[i]f injury results to a worker from the deliberate intention of his or her employer to produce such injury, the worker ... shall have the privilege to take under this title and also have cause of action against the employer as if this title had not been enacted, for any damages in excess of compensation and benefits paid or payable under this title."
Throughout much of the Industrial Insurance Act's (IIA) history, "deliberate intention" meant an assault or battery. Birklid, 127 Wash.2d at 861-62, 904 P.2d 278; see, e.g., Perry v. Beverage, 121 Wash. 652, 209 P. 1102, 214 P. 146 (1922). But our Supreme Court broadened the exception's scope in Birklid. There, the court held that "[t]he phrase `deliberate intention' ... means the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge." Birklid, 127 Wash.2d at 865, 904 P.2d 278.
The plaintiffs' deliberate intention suit theorized that the facts, viewed in a light favorable to them, show so many aggressive episodes and injuries by R.M. that Clover Park actually knew that the plaintiffs would certainly be injured. The claim continues that Clover Park willfully disregarded its actual knowledge by failing to take effective remedial measures to prevent the injuries.

I. Actual Knowledge of Certain Injury
Under RCW 51.24.020, disregard of a known risk of harm or carelessness is not sufficient; although evidence of actual intent to injure is unnecessary, there must be evidence that the employer knew of and ignored certain, rather than potential, harm. Birklid, 127 Wash.2d at 865, 904 P.2d 278; Henson v. Crisp, 88 Wash.App. 957, 961, 946 P.2d 1252 (1997), review denied, 135 Wash.2d 1010, 960 P.2d 937 (1998); Goad v. Hambridge, 85 Wash.App. 98, 104, 931 P.2d 200, review denied, 132 Wash.2d 1010, 940 P.2d 654 (1997). Evidence of negligent or even grossly negligent acts that have a substantial certainty of producing injury is insufficient. Folsom v. Burger King, 135 Wash.2d 658, 664-65, 958 P.2d 301 (1998).
Birklid and Baker v. Schatz, 80 Wash.App. 775, 912 P.2d 501, review denied, 129 Wash.2d 1031, 922 P.2d 97 (1996), concerned workers suffering from illnesses related to on-the-job chemical exposure. In both cases, the employer knew that its employees were suffering from the illnesses and that the illnesses would continue unless the exposure stopped. Our Baker decision followed Birklid and held that such knowledge constituted actual knowledge of certain injury. Birklid, 127 Wash.2d at 863, 904 P.2d 278; Baker, 80 Wash.App. at 783, 912 P.2d 501.
Division One recently applied this reasoning to a more topical set of facts. The student in Stenger v. Stanwood Sch. Dist., 95 Wash.App. 802, 977 P.2d 660 (1999), had cognitive and language skills similar to R.M.'s. The school district placed the student in a special education classroom and took various measures in pursuit of an education consistent with IDEA.[2] But the measures did not prevent the student's frequent, violent outbursts, which resulted in 1,316 to 1,347 injuries to school district staff from 1991 to 1995. Stenger, 95 Wash.App. at 812-13, 977 P.2d 660. These injuries, which were similar in kind to those that R.M. inflicted, spawned six accident reports and three L & I claims. Stenger, 95 Wash.App. at 812-13, 977 P.2d 660. The court concluded that these figures would justify a jury determination that the district had actual knowledge of certain injury. Stenger, 95 Wash.App. at 813, 977 P.2d 660.
With these precedents in mind, we turn now to the instant case. Clover Park first argues that our analysis may consider only those aggressive episodes directed at Vallandigham and Clarke or other staff in deciding whether Clover Park had actual knowledge of certain injury. Clover Park believes that R.M.'s other aggressive episodes and injuries, those aimed at his peers, are not relevant to the actual knowledge of certain injury question. We disagree.
The distinction that Clover Park advocates is a false one. Admittedly, Clover Park's *21 awareness of the plaintiffs' certain injuries would only have been heightened had R.M. directed all of his aggression at Vallandigham and Clarke alone. But our inquiry is not so specific; it must ask, essentially, whether R.M. had a known propensity to injure, and was this propensity so extreme that, from it, Clover Park certainly knew that another injury was forthcoming.
A propensity is "a natural inclination or tendency." WEBSTER'S NEW WORLD DICTIONARY 1139 (2d College Ed.1976). If one has a natural inclination to injure, then that inclination would logically be visited upon more than one or two people. Thus, it is the frequency rather than the object of R.M.'s aggression that logically informs whether Clover Park knew that plaintiffs' injuries were certain. See e.g., Norton v. Payne, 154 Wash. 241, 245, 281 P. 991 (1929) (Parents had duty to control child because "they did know of the habit of their child of striking other children with sticks"; child's propensity did not depend on his aggressive actions toward the person injured) (emphasis added). Thus, each of R.M.'s aggressive episodes influences our inquiry notwithstanding the victim's identity.
As Clover Park moved for summary judgment, we must first consider its burden in deciding whether an issue of material fact indicates actual knowledge of certain injury. See e.g., Coleman v. Hoffman, 115 Wash.App. 853, 64 P.3d 65 (2003). Exhibits that Clover Park attached to its summary judgment motion establish just seven aggressive episodes during the 1998 99 school year. Although these seven episodes may have put Clover Park on notice that an injury was possible or even likely, thus rendering Clover Park negligent or reckless in failing to prevent the injury, no jury could reasonably conclude that seven episodes over the course of several school years establishes actual knowledge of certain injury. As Clover Park takes care to point out, RCW 51.24.020 requires certainty. It is not concerned with mere negligence or recklessness. See Birklid, 127 Wash.2d at 865, 904 P.2d 278. Clover Park thus satisfied its burden of proving the absence of any genuine issue of material fact as to its knowledge of the plaintiffs' certain injuries. Therefore, the burden shifts to the plaintiffs to generate an issue of material fact. See Seven Gables, 106 Wash.2d at 13, 721 P.2d 1.
The plaintiffs' response outlined a litany of aggressive episodes occurring before October 26 and 27, 1999. R.M.'s 1996 Individualized Education Program (IEP) identifies 30 to 45 aggressive episodes during the first quarter of the 1995-96 school year. But, as Clover Park points out, the IEP also notes a decrease in episodes "over the course of the quarter as a result of learning the classroom routine and the staffs' expectations of him." 2 CP at 175. It notes in closing that R.M. "has not exhibited aggressive behaviors for the past few weeks." 2 CP at 176.
The plaintiffs next noted a series of behavioral reports and informal memorandums that described 26 documented injuries resulting from aggressive episodes during the 1998-99 school year. At least one of these injuries garnered a parental response. On March 1, 1999, a student's father wrote a letter to Mark Brinkhaus, who taught R.M. during the 1998-99 year, expressing concern for the safety of his son and other students because "this has happened before to others." 3 CP at 385.
By the plaintiffs' evidence, R.M.'s behavior worsened significantly during the 1999-2000 school year. An October 21 e-mail from Vallandigham to Howard characterizes R.M.'s behavior as "more assaultive and unpredictable" due to a recent change in his medication. 2 CP at 302. Another Vallandigham e-mail sent the following day states, "[w]e have spent this day almost in its entirity [sic] trying to calm [R.M.].... He is out of control of his behaviors.... His mood swings are uncontrollable." 2 CP at 304. And on the day of her injury, October 26, Vallandigham stated that "[u]rgent action is necessary." 2 CP at 306. In sum, for the portion of the 1999-2000 school year ending on or before October 26 and 27, the plaintiffs presented evidence of 24 injuries inflicted during R.M.'s aggressive episodes.
The plaintiffs also pointed to several behavioral assessments, called "Behavior Evaluation Scales," done by staff at R.M.'s school. Mark Brinkhaus completed one on November 1, 1999, noting that R.M. physically hurt *22 other students or teachers more than once a week; he verbally or physically threatened other teachers more than once a week; and he disobeyed teacher's directives or rules on a daily basis. Terry Howard, head of the special education department at R.M.'s school, did another assessment, which covered R.M.'s behavior from September 29 to October 29, 1999. According to this assessment, R.M. verbally or physically threatened other students or teachers more than once a week, and he physically hurt other students or teachers on a daily basis.
The aggressive episodes did not abate during the remainder of the school year. The plaintiffs' evidence reflects over 70 documented injuries occurring after October 26 and 27, 1999. One incident, however, which occurred on March 2, 2000, deserves emphasis. Vallandigham described it:
[R.M.] grabbed Wanda's face by the eye, kicked her after putting his feet on the wall. Wanda moved him to the room [and] he ran to the bathroom to pull things down. She followed. [R.M.] bit Wanda in the back then attack[ed] her and beat her up. I observed the scuff marks on the bathroom floor and took pictures.
. . . .
... Wanda stated that she felt she was beat up. [R.M.] had the strength of a full grown man, like she was beat up by a man.
4 CP at 560.
The plaintiffs also produced estimates by various staff members of injuries that they had received individually during the 1998-99 and 1999-2000 school years:
1. Clarke received 140 to 150 injuries.
2. Wanda Dalton, a one on one aide, received at least five injuries.
3. Curtis Fletcher, a para-educator, received five or six injuries.
4. Machele Lindley, a teacher, received one injury.
5. Bruce Milliman, a principal, received at least two injuries.
6. Charlotte Stelzer, a teacher, received two or three injuries.
7. Craig Thompson, a para-educator, received seven to ten injuries.
8. Gabriele Williamson, a para-educator, received at least 15 injuries.
9. Mary Skinner, a para-educator, received four to six injuries.
10. Vallandigham received 40 to 50 injuries.
These injuries spawned eight L & I claims. Of these, Clarke filed three and Vallandigham filed one.
Finally, deposition testimony by two Clover Park officials indicates their knowledge of the threat that R.M. presented. Virginia Alonzo, director of special education for Clover Park, stated that, as of October 1999, "I would say that there was a probability that he would have other behavior outbursts that could result in injury." 4 CP at 596. Terry Howard stated that he "would figure [R.M.'s behavior] would probably continue if we didn't do anything about it." 2 CP at 234.
Clover Park suggests that no jury could find certainty of injury on these facts. It analogizes certainty of injury here to certainty of injury in Folsom and Goad. But even a brief review of these cases reveals critical factual distinctions that render them valueless in our context.
In Folsom, two Burger King workers were killed by a former co-worker who had a criminal history. The plaintiffs alleged that the employer had actual knowledge of certain injury because he knew of the criminal history, he kept cash at the restaurant, and his restaurant lacked an active security system or peephole. Folsom, 135 Wash.2d at 667, 958 P.2d 301. The Supreme Court recognized that this evidence may have established negligence but held that the facts would not allow a certain injury finding. Folsom, 135 Wash.2d at 667, 958 P.2d 301. And in Goad, the plaintiff severely injured his hand in a planer accident at the defendant's sawmill. Evidence showed that the successor to the planer's manufacturer had repeatedly warned the sawmill of potential injury and advised the sawmill to install guards on the machine. Goad, 85 Wash.App. at 100-01, 931 P.2d 200. The court held that the plaintiff presented no evidence establishing knowledge of certain injury. Goad, 85 Wash.App. at 104, 931 P.2d 200.
The Folsom and Goad plaintiffs may have had a good case for negligence or gross *23 negligence. Their evidence clearly established risks that the employer should have heeded. But, as the plaintiffs note, Folsom and Goad did not involve a history of injury. In fact, in neither case was the plaintiff or any other employee previously injured in any relevant manner. Whether this case involves a history of injury is not debatable; it certainly does. Therefore, Folsom and Goad do not guide our decision.
The plaintiffs' history of injury evidence, in a light favorable to them, establishes injuries and aggressive episodes dating back to the 1995-96 school year. Their evidence showed that injury frequency increased significantly over time until October 1999, when R.M. injured students and staff at a rate of one per day; by this time, according to the depositions of Clover Park officials, Clover Park believed that more injuries were "probable." And a numerical analysis reveals 150 to 160 documented injuries. But the actual number of injuries could have been significantly higher, as Clarke stated that she alone received 140 to 150 injuries during the 1998-99 and 1999-2000 school years.
Without setting a threshold requirement as to number of injuries, which would only be arbitrary, we hold that the plaintiffs' evidence would support a jury finding that an injury, regardless of its timing or severity, was certain.
Next, we must decide whether an issue of material fact exists as to Clover Park's actual knowledge. We believe that the plaintiffs' evidence clearly discloses the required factual issue.
R.M.'s first IEP conference occurred on January 16, 1996. The resulting IEP noted 20-45 aggressive episodes during the first quarter of the 1995-96 year. R.M.'s next IEP, dated November 13, 1998, contains an aversive therapy plan that notes that staff attempts to intervene with "redirection and physical prompts" have failed because R.M. "simply refuses to be compliant." 2 CP at 181. The plan prescribes a "basket hold ... (i.e., arms across chest, remaining in seat)," for R.M.'s future, physical restraint. 2 CP at 181. Clover Park undoubtedly knew the contents of these IEPs, giving it knowledge as early as 1995-96 that R.M. presented a threat.
District officials also gave direct evidence of Clover Park's actual knowledge. Howard indicated in his deposition that, when he executed the aforementioned Behavior Scale, he expected R.M.'s aggressive episodes to continue at a rate of one per day. And during her deposition, Alonzo provided further evidence of Clover Park's knowledge:
Q. Let's go back to the IEP January of 1996. When it says, "[h]e would pull hair, hit, bite, scratch, or kick," he's either injuring students or staff; is he not?
A. Yes.
Q. And when it says in January 31st of 1997, "[h]e is hitting others, mostly the same peer, but has hit a staff member on at least one occasion less than two weeks ago," and then when it says, "[h]e hits one to two times a day," that basically indicates that someone at Clover Park School District realized that he was attacking and injuring other students back as early as January of 1997, does it not?
A. Yes.
Q. And he continued to attack and injure other students up into the school year, through the school year of '99/2000, did he not?
A. Yes.
4 CP at 594.
And the record is replete with e-mail and other memoranda to officials at R.M.'s school detailing his behavior generally and certain specific assaults. This evidence was sufficient to defeat summary judgment on the actual knowledge issue.

II. Willful Disregard
The plaintiffs must next show that Clover Park willfully disregarded its knowledge of their certain injury. Birklid, 127 Wash.2d at 865, 904 P.2d 278. They encourage us to follow Division One's approach to willful disregard, which states the inquiry as follows:
our inquiry on review must focus on whether a jury could conclude that [the school district's] efforts to accommodate... were inadequate and thus constitute willful disregard under the Birklid rule. Stenger, 95 Wash.App. at 813, 977 P.2d 660.
We disagree with the nature of our inquiry as Division One described it. By focusing on *24 the efficacy or adequacy of the remedial measures, Stenger impermissibly erodes the requirement of "deliberate intent."
Clover Park correctly implies that the efficacy of its remedial measures is a negligence issue. The effectiveness of an act in preventing a known risk, even where the risk is certain to occur, is merely another way of questioning the reasonableness of the preventative measure. It would be just as well to ask whether Clover Park observed the proper standard of care in acting to prevent the plaintiff's injuries. But this does not properly characterize our task under the willful disregard prong as it is contrary to the deliberate intention exception's history and the Birklid reformulation.[3]
Negligence, even gross negligence, cannot satisfy the deliberate intention exception. See Birklid, 127 Wash.2d at 860, 904 P.2d 278. And Birklid did not focus on the adequacy of the response as a weighing factor in determining willful disregard. Therefore, as it is inconsistent with Birklid, we do not follow Stenger.
We will refrain from further definition of willful disregard other than to say that it clearly does not exist under these facts. Unlike the employer in Birklid, Clover Park did not ignore its knowledge of the plaintiffs' certain injuries. It took the following steps:
1. contacted R.M.'s doctor about the change in medication;
2. performed a functional behavioral analysis to determine the cause of R.M.'s behavior;
3. continued documenting R.M.'s behavior;
4. called an IEP meeting to discuss R.M.;
5. assigned a temporary aide to work directly with R.M.;
6. hired a permanent one-on-one aide to work directly with R.M.;
7. created a separate area outside the classroom for use as an isolation or time-out space;
8. offered restraint training and issued walkie-talkies to selected staff;
9. sent staff members to observe R.M. at the Frances Haddon Morgan Center, where he had been placed for observation and assessment, to discuss placement, intervention, and behavioral issues;
10. placed R.M. in a half-day program;
11. staff from the Center visited the District to discuss R.M. and his placement;
12. considered alternative placements for R.M., but declined these alternatives because they were inappropriate or unwilling to take R.M.
From this evidence, reasonable minds could reach but one conclusion: Clover Park did not willfully disregard the plaintiffs' certain injuries. Therefore, the superior court did not err in granting summary judgment in Clover Park's favor.
Affirmed.
We concur: ARMSTRONG, J., and QUINN-BRINTNALL, A.C.J.
NOTES
[1] Vallandigham taught the special education class, and Clarke was a paraeducator. The record does not specify the nature of a paraeducator's duties, but it is clear that they assist in both instructional and behavioral matters.
[2] Individuals with Disabilities Education Act, 20 USCA § 1401 et seq.
[3] While it is certainly true, as the plaintiffs point out, that remedial measures may be so clearly and predictably impotent that they amount to a willful or intentional disregard of an injury, that is not the case here.