# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

SAMUEL TESSEMA, an individual,

Appellant,

v.

MACMILLAN-PIPER, INC., a
corporation,

Respondent

JOHN and JANE DOES 1 – 10,
INDIVIDUALS; and ABC, DEF, GHI,
and KJL CORPORATIONS,

Defendants.

No. 77189-2-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: October 22, 2018

APPELWICK, C.J. — Tessema brought a negligence action against MacMillan-Piper, seeking to recover for injuries he suffered when he slipped and fell on a metal staircase at a MacMillan-Piper facility. Tessema argues that the trial court erred in granting summary judgment dismissal. He asserts that the staircase was in an unsafe condition due to code violations and ice and that MacMillan-Piper had notice of the unsafe condition. We reverse.

## FACTS

Samuel Tessema is a self-employed truck driver who has worked as an independent contractor for MacMillan-Piper, Inc. since 2006. Five days a week, he moves shipping containers between one of MacMillan-Piper's four facilities and

the port. Most of the time, he moves containers between the Airport Way Facility and the port. At the facility, he uses a metal staircase to walk up to dispatch. The staircase has been at the facility for about six or seven years. Since MacMillan-Piper placed the staircase, Tessema has used it every day.

On the morning of November 24, 2014, Tessema had just received his second dispatch and had started walking down the staircase for the second time that morning. While descending, his left foot slipped on the third from the last step and he fell, causing injury. No one observed the fall. Tessema had not fallen on the staircase prior to this incident.

On December 9, 2014, about two weeks after his fall, Tessema sought medical treatment at a clinic.

On July 29, 2016, Tessema filed a negligence claim against MacMillan-Piper. In his complaint, he alleged MacMillan-Piper breached its duty of care by failing to maintain its premises in a safe condition—namely, "the unstable stairway on the loading dock." As a result of MacMillan-Piper's negligence, Tessema alleged he suffered injury.

During Tessema's deposition, he offered the following testimony about ice on the staircase:

> Q. Were the stairs slippery?
>
> A. There is ice. The day there is ice.
>
> Q. There was ice on the stairs?
>
> A. I didn't see before, you know, slippery. I slipped from the stairs. I don't remember after that.

2

Q. Okay. So are you saying you don't know if there was ice on the stairs?

A. Yeah.

Q. So you're not sure what made your foot slip?

A. Yes.

Later, when asked if he thought that ice contributed to his foot slipping, Tessema responded, "Yes."

Tessema also offered the following testimony about why he thought his foot slipped:

At the moment, you know, I'm going to go to my truck, I'm trying to get to the front. I don't know if this is ice on the top of that or something else. After the incident when I see, even the stairs is shaking.

When asked if he noticed the stairs shaking before his fall, he responded, "No, I don't know." When asked if he thought the stairs shaking contributed to his fall, he responded, "I think so."

MacMillan-Piper filed a motion for summary judgment dismissal of Tessema's negligence claim. It argued that there was no evidence of an unsafe condition on the stairs where Tessema fell and no evidence that it had actual or constructive notice of an unsafe condition. In support of its motion, MacMillan-Piper relied on Tessema's deposition testimony, a declaration by John Odland, vice president of MacMillan-Piper, climatological records showing that the low temperature at Boeing Field the day Tessema fell was 39 degrees, and Tessema's driver log.

3

Tessema opposed the motion, relying on his own deposition, his medical records, MacMillan-Piper's answers to his interrogatories, an expert report by Dr. Daniel Johnson, and a declaration by Tony Barter, MacMillan-Piper's former logistics manager. In Barter's declaration, he stated that he "saw ice on the stairs" the day Tessema fell, and that Tessema told him "he fell because the stairs were slick, icy and wobbly." Barter also stated that Joe Fisher, MacMillan-Piper's former Warehouse Manager, poured rock salt on the stairs "approximately 20 to 30 minutes after Samuel's fall."

After a hearing on the motion, the trial court excluded two pieces of evidence as inadmissible hearsay. First, it excluded Barter's statement that Tessema told him "he fell because the stairs were slick, icy and wobbly." Second, it excluded Tessema's statement to an advanced registered nurse practitioner (ARNP) that he slipped on ice. The ARNP who treated Tessema stated he told him that he "slipped on ice and fell on his L[eft] hand outstretched."

Next, although the court accepted the statements in Dr. Johnson's report, it did not accept his conclusions. It stated that his conclusions were unsupported "by the reports that are provided in these materials." The trial court found that his report did not rise to the level of creating a question of fact in the case.

And, the trial court found that although there "could be a triable issue as to whether there was ice," a jury would not be able to conclude that MacMillan-Piper had notice of ice on the stairs. The court based this conclusion on Barter's timing, the timing of the fall, Mr. Odland's testimony about the number of people using the staircase that day, Tessema's use of the staircase earlier that day, and the

4

absence of anyone reporting issues prior to Tessema's fall. The trial court granted summary judgment in favor of MacMillan-Piper, dismissing Tessema's claim.

Tessema appeals.

## DISCUSSION

Tessema makes two main arguments. First, he argues that the trial court erred in granting summary judgment, because he presented evidence that MacMillan-Piper's code violations and ice on the staircase created an unsafe condition. Second, he argues that sufficient evidence exists to support an inference that MacMillan-Piper had actual and constructive notice that the staircase was in an unsafe condition.

This court reviews summary judgment orders de novo. Hadley v. Maxwell, 144 Wn.2d 306, 310-11, 27 P.3d 600 (2001). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Peterson v. Groves, 111 Wn. App. 306, 310, 44 P.3d 894 (2002). When considering the evidence, the court draws reasonable inferences in the light most favorable to the nonmoving party. Schaaf v. Highfield, 127 Wn.2d 17, 21, 896 P.2d 665 (1995).

Evidentiary rulings are ordinarily reviewed for abuse of discretion. Momah v. Bharti, 144 Wn. App. 731, 749, 182 P.3d 455 (2008). However, this court reviews de novo all trial court rulings made in conjunction with a summary judgment motion. Id.

To establish a cause of action for negligence, a plaintiff must demonstrate that (1) the defendant owed the plaintiff a duty, (2) the defendant breached that

5

duty, (3) damages resulted, and (4) the defendant's breach proximately caused the damages. Tincani v. Inland Empire Zoological Soc'y, 124 Wn.2d 121, 127-28, 875 P.2d 621 (1994). The threshold determination of whether the defendant owes a duty to the plaintiff is a question of law. Id. at 128. In premises liability actions, a person's status, based on the common law classifications of persons entering upon real property (invitee, licensee, or trespasser), determines the scope of the duty of care owed by the possessor (owner or occupier) of that property. Id. Here, the parties agree that Tessema was a business invitee.

An owner is liable for harm to business invitees if he or she (1) knows of, or by the exercise of reasonable care would discover, a condition presenting an unreasonable risk of harm; (2) should expect that invitees would not discover the danger or would fail to protect themselves from it; and (3) fails to exercise reasonable care to protect invitees against the danger. Iwai v. State, 129 Wn.2d 84, 93-94, 915 P.2d 1089 (1996). To demonstrate knowledge of an unsafe condition, an invitee plaintiff must show that a proprietor caused the condition or had actual or constructive notice of it. Coleman v. Ernst Home Ctr., Inc., 70 Wn. App. 213, 217, 853 P.2d 473 (1993). Constructive notice will be inferred if the condition exists long enough for a person exercising ordinary care to discover it. Wiltse v. Albertson's. Inc., 116 Wn.2d 452, 459-60, 805 P.2d 793 (1991).

I.  Code Violations

Tessema argues that MacMillan-Piper's failure to comply with code requirements created an unsafe condition on the stairs. Based on Dr. Johnson's conclusions that these violations contributed to his fall, Tessema also argues that

MacMillan-Piper had constructive notice of the violations and, prior to his fall, should have repaired and safeguarded the stairs.

A. Unsafe Condition

Relying on expert testimony by Dr. Johnson, Tessema asserts that the stairs were not compliant with either building code in effect in the state, because MacMillan-Piper (1) allowed excessive variation between steps in excess of 0.38 inches, (2) failed to mark the stair nosing with a distinctive stripe, (3) had unstable stairs and failed to fix the stairs in place, and (4) failed to make the handrail 2.5 inches higher.

Expert testimony is admissible when (1) the witness qualifies as an expert, (2) the opinion is based upon an explanatory theory generally recognized in the scientific community, and (3) if it will be helpful to the trier of fact. ER 702; In re Pers. Restraint of Morris, 176 Wn.2d 157, 168-69, 288 P.3d 1140 (2012). Expert testimony is helpful if it concerns matters beyond the average layperson's common knowledge and is not misleading. State v. Groth, 163 Wn. App. 548, 564, 261 P.3d 183 (2011). An expert must rely on facts and data, not mere speculation. See Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha, 126 Wn.2d 50, 103, 882 P.2d 703, 891 P.2d 718 (1994). Conclusory opinions lacking adequate foundation will be excluded. Miller v. Likins, 109 Wn. App. 140, 148, 34 P.3d 835 (2001).

Dr. Johnson based his report on a conversation he had with Tessema and his own observations and measurements of the staircase. He found that, in violation of code, there was excessive variation between the staircase's steps, the stair nosings were not demarcated, the staircase was not fixed in place, and the

7

staircase's handrails were too low. He concluded that if these code violations had not been present, then, on a more probable than not basis, Tessema's fall would have been prevented.

The trial court did not accept Dr. Johnson's opinions that alleged code violations contributed to Tessema's fall, finding that they were unsupported by the record. The court stated that there was "no indication from Mr. Tessema nor anyone that the nosings or the variation or the handrails were a factor." It also stated that the evidence failed to connect any vibration or instability to Tessema's fall. At issue is whether there is sufficient evidence to create a genuine dispute of fact as to whether code violations caused Tessema's fall.

Tessema argues that regardless of whether he knows what caused him to slip, there is sufficient expert testimony to create genuine issues of material fact on whether MacMillan-Piper's alleged code violations were the proximate cause of his injuries. He relies on Mehlert v. Baseball of Seattle, Inc., 1 Wn. App. 2d 115, 404 P.3d 97 (2017).

Causation is usually a question for the jury. Id. at 119. However, it becomes a question of law for the court when the causal connection is so speculative and indirect that reasonable minds could not differ. Id.

In Mehlert, the plaintiff fell while leaving a store and landed at the bottom of a set of stairs, injuring herself. Id. at 116-17. A ramp had been placed over the stairs to make the store accessible by wheelchair, and there were no required handrails adjacent to the ramp or the stairs. Id. at 116. This court held that a genuine issue of fact existed regarding whether the absence of required handrails

was the proximate cause of Mehlert's injuries. Id. It based its holding on expert testimony that appropriate handrails would have lessened or prevented Mehlert's injuries and Mehlert's testimony. Mehlert testified that she did not remember what caused her fall, there were no witnesses to her fall, and she remembered wanting to reach for something to stop her fall. Id. at 119.

Here, the alleged handrail violation involves handrail height, not the absence of handrails. But, like Mehlert, Tessema does not know what caused him to slip, and no one witnessed him falling. Dr. Johnson states that if the handrails had been higher, "then, on a more probable than not basis Mr. Tessema would have been able to exert more force to them and avoided falling."

When descending the stairs, Tessema was holding paper (and/or a pen) in his hands. When asked if he was holding on to the handrails, Tessema testified, "I don't think." But, he concluded that as he fell he thought he tried "to hold it."

On summary judgment, we review the facts in the light most favorable to the nonmoving party. Vallandigham v. Clover Park Sch. Dist. No. 400, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). A reasonable jury could infer that Tessema attempted to grab the handrail. A question of fact remains as to whether a code-compliant handrail could have lessened or prevented Tessema's injuries.

Dr. Johnson also found excessive riser and run variation on the staircase. He states that if riser height increases or run length decreases after the first step or two—which they did here—"the ball of the foot can easily and inadvertently be placed on or beyond the nosing." The foot can then "slide or pivot over the edge of the nosing." He cites numerous studies finding excessive variation between

steps a common factor among falls. He also states that the decrease in run length "would not have been visually noticeable to a person looking straight down at the treads."[1] Tessema testified that his left foot slipped "from the point" on the third from the bottom step on the staircase. Upon falling, he held his left hand out and his right knee scratched the ground. Based on this evidence, a reasonable jury could infer that the ball of Tessema's foot could have easily and inadvertently been placed on or beyond the nosing and that his foot slid or pivoted over the edge of the step's nosing due to excessive variation between the steps.

Last, Dr. Johnson noted that the staircase was not fixed in place on the day of the fall and "vibrated considerably when force was applied by hand." He states that "[a]ny vibration whatsoever would have increased the chance of a misstep." Nothing in evidence suggests a source of force applied to the stairs except by Tessema during his descent. Tessema testified that after the incident, he saw the stairs shaking. When asked if he noticed the stairs shaking before his fall, he responded, "No, I don't know." But, when asked if shaking contributed to his foot slipping, he responded, "I think so." Reviewing the facts in a light most favorable to the nonmoving party, a reasonable jury could infer that the staircase's instability was a contributing factor to the proximate cause of Tessema's injuries.

---

[1] Similarly, Dr. Johnson concluded that if a yellow stripe had been painted on the stair nosings, this would have increased Tessema's ability to place his feet accurately. But, because the nosings had the same reflectance as the other sections of the steps, they were not readily discernible. Based on this testimony, a reasonable jury could infer that if the nosings had been emphasized, their different reflectance from the other sections of the steps could have increased Tessema's ability to place his foot accurately.

Dr. Johnson's opinions that alleged code violations contributed to Tessema's fall are supported by evidence sufficient to create a genuine question of fact as to causation.

B. Notice of Code Violations

Tessema argues next that MacMillan-Piper had constructive notice of the staircase's alleged code violations because it "had control over the stairs and placed them on [its] premises."[2] He asserts that the staircase has been on MacMillan-Piper's premises for six or seven years, affording it "sufficient opportunity to have made a proper inspection of the premises and to have remedied the danger."

"Constructive notice arises where the condition 'has existed for such time as would have afforded [the proprietor] sufficient opportunity, in the exercise of ordinary care, to have made a proper inspection of the premises and to have removed the danger.'" Ingersoll v. DeBartolo, Inc., 123 Wn.2d 649, 652, 869 P.2d 1014 (1994) (alteration in original) (quoting Smith v. Manning's, Inc., 13 Wn.2d 573, 580, 126 P.2d 44 (1942)). It is ordinarily a question of fact for the jury whether, under the circumstances, "a defective condition existed long enough so that it would have been discovered by an owner exercising reasonable care."

---

[2] MacMillan-Piper argues that we should not consider issues regarding constructive notice based on agency or code violations, because Tessema never raised or argued these issues before the trial court. However, Tessema did raise these issues in his opposition to MacMillan-Piper's motion for summary judgment: "That act, coupled with the declarations of Mr. Barter and Dr. Johnson, it should be reasonably inferred that defendant had constructive knowledge that [it] had time to remove the danger and prevent the fall."

11

Fredrickson v. Bertolino's Tacoma, Inc., 131 Wn. App. 183, 189, 127 P.3d 5 (2005).

Tessema testified that the staircase has been at MacMillan-Piper's Airport Way Facility for about six or seven years. MacMillan-Piper does not dispute this testimony, the existence of alleged code violations, or its control over the staircase. A reasonable jury could therefore infer that the alleged code violations existed long enough so that MacMillan-Piper could have discovered them by exercising reasonable care.

## II. Ice on the Stairs

Tessema argues next that there is sufficient evidence that ice on the staircase created an unsafe condition, that MacMillan-Piper had both actual and constructive notice of the condition, and that the condition was at least reasonably foreseeable to MacMillan-Piper.

### A. Unsafe Condition

To establish that ice created an unsafe condition on the staircase, Tessema relies primarily on two pieces of evidence: (1) Barter's declaration, which includes his statements that he saw ice on the staircase the day Tessema fell, and that Tessema explained to him he fell because the stairs were "slick, icy and wobbly;" and (2) his own medical record, which includes his statement to an ARNP that "[h]e slipped on ice and fell."

MacMillan-Piper argues that ice could not have contributed to Tessema's fall, because climatological records judicially noticed by the trial court establish "the impossibility of ice at the time of the fall." The records establish that on the day

12

Tessema fell, the recorded low temperature at Boeing Field was 39 degrees. The trial court took judicial notice that the low temperature was above freezing. However, the court did not treat the records as dispositive evidence that there could not have been ice on the staircase: "I have taken judicial notice of what appears to be an impossibility of ice . . . . I'm going to stop and say, I don't think that that necessarily answers the question." Likewise here, we do not accept the records as dispositive.

The trial court excluded Barter's statement about Tessema's explanation of his fall and Tessema's statement to an ARNP that he slipped on ice as inadmissible hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. ER 801(c). Hearsay cannot be admitted into evidence unless an exception applies. See ER 802. Tessema's explanation within Barter's declaration constitutes an out-of-court statement, and Tessema does not establish that he is offering the statement into evidence other than to prove its truth. It is therefore not admissible.

Tessema argues that his statement to the ARNP that he "slipped on ice and fell" is admissible under an exception in ER 803(a)(4), because it was reasonably pertinent to his medical diagnosis or treatment. Relying on State v. Butler, 53 Wn. App. 214, 217, 766 P.2d 505 (1989), he argues that statements as to causation, such as "'I was hit by a car,'" would be allowed, but statements as to fault, such as "'which ran a red light,'" would not. Applying that reasoning here, the reason Tessema fell—slipping on a staircase—is admissible, because it goes to

13

causation. But, the reason he offers for slipping—ice—is not admissible, because it goes to fault. The trial court properly excluded both statements.

When asked at his deposition if the stairs were slippery, Tessema responded, "There is ice. The day there is ice." When asked if there was ice on the stairs specifically, Tessema responded, "I didn't see before, you know, slippery. I slipped from the stairs. I don't remember that." But, he responded, "Yes," when asked if he thought that ice contributed to his foot slipping.

In addition, Tessema testified that when he went to do his first dispatch before falling, he noticed ice on his windshield and at the facility. He was then asked, "[W]hen you came back for your second dispatch, was there still ice on the ground and ice on the Airport Way facility?" Tessema responded, "Yes. Even midday there is ice on the ground." Later in the deposition, he was asked, "I'm just asking if you know what you slipped on." Tessema responded, "I didn't see."

Without the evidence properly excluded by the trial court, Tessema relies on Barter's declaration and his own deposition testimony. In his declaration, Barter states that "[o]n the day of Samuel's fall, November 24, 2014, I saw ice on the stairs." He does not specify what time of day he saw ice on the stairs. In addition, he states that he saw Fisher apply rock salt to the stairs the day Tessema fell, but Fisher "did not pour rock salt until approximately 20 to 30 minutes after Samuel's fall."[3] Barter recalls that Fisher also applied rock salt to the stairs the day before Tessema's fall, and that the stairs were icy the day before Tessema's fall.

---

[3] MacMillan-Piper made no objection to the consideration of this statement. We limit our consideration to whether it supports an inference that ice may have

Taken in the light most favorable to the nonmoving party, Tessema's direct testimony and Barter's declaration create a genuine question of fact as to whether there was ice on the staircase when Tessema fell, and whether it was a proximate cause of Tessema's fall.

B. Notice of Ice On Stairs

Tessema argues that MacMillan-Piper had both actual and constructive notice of ice on the staircase. He asserts that MacMillan-Piper had actual notice because Barter and Fisher, MacMillan-Piper's agents, knew that there was ice on the stairs the day before his fall. He also asserts that MacMillan-Piper had constructive notice because Barter testified that he saw ice on the stairs the day before and the day of Tessema's fall, and that he saw Fisher apply rock salt to the stairs the day before Tessema's fall.

Odland, MacMillan-Piper's vice president, states in his declaration that no one reported slipping or falling on the staircase prior to Tessema's fall. He also states that no one reported that the stairs "were icy, were slippery, or reported any problem with the stairs before Tessema's fall on November 24, 2014." In an interrogatory answer, MacMillan-Piper states that "[t]here is no specific person or entity responsible for the maintenance or cleaning" on its premises.

Barter, a MacMillan-Piper employee, arrived at the facility between 7:00 and 7:30 a.m. the day of Tessema's fall. Tessema stated that he fell in the morning. Barter saw ice on the staircase the day of and the day before the fall. He knew

---

been present at a point in time after the fall, but not for purposes of whether MacMillan-Piper had notice of the presence of ice prior to the fall.

rock salt was applied to the staircase the day before the fall. And, he recalls the stairs being icy the day before, "because it was an unusually cold and icey [sic] couple of days in November." It is ordinarily a question of fact for the jury to decide whether a defective condition existed long enough to be discovered. Fredrickson, 131 Wn. App. at 189. There is no evidence that there was ice on the step on which Tessema fell. However, in a light most favorable to the nonmoving party, a jury could conclude that MacMillan-Piper had constructive notice of icy conditions on the stairs. This is sufficient to deny summary judgment.[4]

We reverse.

_Appelwick, C.J._

WE CONCUR:

_Andrus, J._          _Dwyer, J._

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2018 OCT 22 AM 8: 44

---

[4] We do not address Tessema's alternative argument that the risk of someone slipping and falling on the staircase was reasonably foreseeable and therefore an exception to the requirement of actual or constructive notice.